LORI E. ANDRUS (SBN 205816)
lori@andrusanderson.com
JENNIE LEE ANDERSON (SBN 203586)
jennie@andrusanderson.com
ANDRUS ANDERSON LLP
155 Montgomery Street, Suite 900
San Francisco, CA  94104
Telephone:    (415) 986-1400
Facsimile:     (415) 986-1474

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE,<br><br>             Plaintiff,<br><br>        vs.<br><br>VIRGIN AMERICA, INC, ALASKA AIR GROUP, INC., and STUART DINNIS,<br><br>             Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## I.    INTRODUCTION

1.    Plaintiff Jane Doe ("Plaintiff") brings this action following a sexual assault by Defendant Stuart Dinnis ("Dinnis"), a Virgin America, Inc. ("Virgin") executive.  Plaintiff alleges, upon information and belief, as follows:

## II.    PARTIES

2.    Defendant Virgin America, Inc. is a corporation incorporated in the state of Delaware with its principal place of business in Burlingame, California.

3.    Defendant Alaska Air Group, Inc. ("Alaska") is a corporation incorporated in the state of Alaska, with its principal place of business in Seattle, Washington.  Alaska is the parent company of Virgin.

4. Virgin and Alaska are jointly and severally liable for each other's negligence, misconduct and wrongdoing as alleged herein, in that they operate as a single business enterprise.

5. Virgin and Alaska were each agents and/or employees of the other and in acting and/or failing to act as alleged herein were operating in the course and scope of said agency and/or employment relationship.

6. Collectively, Virgin and Alaska are referred to herein as "the Airline Defendants."

7. Defendant Stuart Dinnis is an adult man currently residing in Brisbane, Australia. At the time of the assault, Mr. Dinnis was employed by Virgin, and was a resident of California.

8. Plaintiff Jane Doe is an adult woman residing in Texas. Plaintiff is using a pseudonym in this litigation to protect her privacy and will seek permission to proceed under this pseudonym.

### III. JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

9. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(a)(1) and (a)(3). The controversy exceeds the value of $75,000 and is between citizens of different states and a citizen of a foreign country.

10. This Court has supplemental jurisdiction over the state law claims contained herein pursuant to 28 U.S.C. § 1367(a).

11. Virgin maintains its corporate headquarters in this district (Burlingame) and regularly conducts business in this district. Virgin has thus purposefully availed itself of the benefits, profits and privileges deriving from its business activities in this district.

12. A substantial part of the events giving rise to Plaintiff's claims occurred in this district/division. 28 U.S.C. § 1391(b)(2), Civ. L.R. 3-2(c).

### IV. FACTUAL ALLEGATIONS

13. In the fall of 2016, Plaintiff was a Vice President for Research Now, a global expert in online market research data. In that role, Plaintiff was responsible for business development and management of panel partnerships. Her job responsibilities included building and maintaining key strategic relationships with loyalty professionals, including airline executives.

14. Plaintiff and her boss travelled to the Mega Loyalty Conference in Toronto, Canada. The conference attracted professionals in the travel and loyalty sector from around the world, including

Stuart Dinnis, then Director of Loyalty at Virgin.

15.     On October 24, 2016, Plaintiff and her boss worked out of the Research Now offices in Toronto. In a meeting that afternoon, they discussed their objectives for the conference.  They discussed all attendees who currently partnered with Research Now, including Virgin and Dinnis.  Plaintiff understood the importance of that business relationship.  To Research Now, Virgin was a valuable account, and Dinnis a key player with whom Plaintiff should meet. They also discussed attendees/companies who would be key to network with in terms of new business development and partnership growth.

16.     That evening, Plaintiff and her boss attended the Points.com Partner Appreciation Party along with several other colleagues and partners.  Their stated objectives for the event were to spend time with existing partners and to network with prospective partners.  This was an evening for business development.

17.     Late in the evening, a colleague introduced Plaintiff to two Virgin employees who directly reported to Dinnis.  After a brief conversation, their boss, Defendant Dinnis walked up to the group. Plaintiff introduced herself, but the music was loud and made conversation difficult.  Their initial interaction was very short.

18.     People began dancing, including Plaintiff and a female colleague.  Dinnis approached Plaintiff and gave her a "twirl."  Though he was at the event in a professional capacity, and in the course and scope of his employment with Virgin, he was noticeably drunk.  Plaintiff left the dance area.  A short while later, Dinnis approached Plaintiff again.  He stumbled and spilled red wine on Plaintiff's face and in her hair.  Dinnis did not seem to notice he had done this; others helped clean up the spill.  Plaintiff went to the restroom.  When she returned to her colleagues, they decided to take a cab back to the hotel.

19.     When Plaintiff and her colleagues arrived back at the hotel, around 1:00 a.m., Dinnis had already returned, and was waiting for her in the lobby.  Dinnis knew that, given Plaintiff's position with Research Now, and her need to preserve their professional relationship, she would be reluctant to react in a way that could harm her company's relationship with a major client like Virgin.  Intent on exploiting Plaintiff's professional vulnerability, Dinnis approached the group as they were saying their goodbyes.

20.     Plaintiff's colleagues went to one elevator bank, but her floor was serviced by a different elevator

3
COMPLAINT

bank, so she was on her own.  Dinnis followed her into the elevator.

21.     The elevator required a key card to operate.  The key card sensor was not operating properly and Plaintiff pressed her key card to the sensor multiple times, trying to get it to work.  The two commented on the fact that the elevator was difficult to use, and briefly engaged in other small talk.

22.     Suddenly, without warning or invitation, Dinnis kissed Plaintiff.  Plaintiff grabbed his right arm.  Dinnis was gripping her face tightly.  She tried pulling his arm away from her.  He was aggressively kissing her and would not stop.

23.     When the elevator came to his floor, Dinnis said "Come on, come with me."  Plaintiff repeatedly declined.  Dinnis tried to physically pull Plaintiff off of the elevator by the back of her neck.  At that point, Plaintiff knew things were escalating to a dangerous situation.

24.     His hands swept over the back of Plaintiff's head; he pulled her by the hair.  She resisted, pulling her head away from his.  She leaned back to stay on her feet, and inside the elevator.  Dinnis pulled her by the hand.  She leaned against the right side of the elevator with her foot wedged to try and keep herself inside.

25.     When Dinnis realized Plaintiff was not going to his room willingly, he stepped back into the elevator and started kissing her again as the elevator started descending.  This time he was even more aggressive, grabbing her rear end and pulling her roughly against his groin.  Dinnis is much taller and much stronger than Plaintiff.  There was no maneuvering out of his grasp.  He was aggressive and relentless.

26.     Plaintiff pressed her fist into his chest and kept saying "No."  When the elevator came to a stop, she again tried to get her room key to scan so she could get to her floor and the safety of her room.

27.     By this point, the elevator had returned to the ground floor.  When the doors opened, Dinnis quickly pressed the "Close Door" button, but Plaintiff saw two colleagues she knew outside the elevator.  She quickly called out to them, and one of them reached his hand into the elevator to keep the doors from closing.  Her colleague, a prior business associate in the loyalty sector, entered the elevator.  Relieved, Plaintiff stepped to the back of the elevator and made small talk with her colleague.  Unfortunately, his room was on a lower floor than hers.  When her colleague left the elevator, Plaintiff froze.

28.     Dinnis resumed his attack.  His hands were holding Plaintiff's neck as he forcibly kissed her; she was unable to escape him.  She turned her head from side to side, trying to make it stop.  As many times as she said, "No," he said "Yes."  She pressed her lips tight, only for him to kiss around her mouth and face.  Dinnis asked several times for her to go to his room.  Plaintiff repeatedly said "No, goodnight."

29.     When the elevator came to her floor, Plaintiff quickly exited, hoping that would be the end of the encounter.  Her room was just a few steps from the elevator doors.  She had her key out.  She hoped she would soon be safely in her room, but Dinnis had followed her.  As she swiped her key card in the door, Dinnis grabbed her by the back of the neck.  He thrust her head forward into the door and began pushing her into the hotel room.

30.     Terror filled Plaintiff's head as he said, "You want it."  She knew she had to fight now.  She had to keep Dinnis out of her hotel room.

31.     Plaintiff bent her knees and crouched down low to the ground.  She pushed back as hard as she could to get back into the hallway.  She silently kept telling herself "get leverage, get low" – a technique taught to her son and practiced in football when facing a much larger opponent.

32.     Dinnis tried to pull her to her feet.  She fought off his hands and yelled out "No!" and "Stop!" several times.  She kept herself crouched against the wall in the hallway.

33.     When Dinnis realized that she wasn't getting up, he finally walked away, leaving Plaintiff shaking and terrified.

34.     Plaintiff waited to make sure he was gone and checked the area around the elevator before opening her hotel room door again.

35.     Plaintiff's mouth was raw and her left ear was burning.  She noticed that an earring was missing.

36.     At 1:59 a.m. Dinnis sent Plaintiff a message via LinkedIn stating: "Are you sure?  I have a suite if you're keen. xx."

37.     In the morning, Dinnis sent a separate message via the conference app, telling Plaintiff that he "would like to connect further xx."

38.     When Plaintiff next ran into Dinnis at the conference, he asked if she had received his messages. He said, "read them and let me know what you think."  At this point, Plaintiff realized that he was not

going to stop pursuing her.  So, at 10:40 a.m., she responded to his messages with: "Given our key partnership with your organization, it's best we keep things strictly professional."

39.    At 11:27 a.m., Dinnis messaged again, apologizing for his behavior, commenting on her attractiveness ("you're a gorgeous woman").  He also sent a photo of Plaintiff's earring, asking if it was hers, and explaining that he had found it looped on his jacket button.  Though it was, indeed, a picture of her earring, Plaintiff said "no," to avoid seeing him again.

40.    Since the assault, Plaintiff has experienced high anxiety while travelling, particularly in elevators. As a result of the assault, she left her employment with Research Now, which required her to travel alone on a regular basis both domestically and internationally.

41.    Dinnis selected Plaintiff as his victim knowing it was important for her professional standing that she not upset business partners and hoping that would make her an easy target.  That was his known *modus operandi*.

42.    Virgin was well aware that Dinnis was known for carrying out lewd and drunken behavior in front of business associates and other Virgin employees, and sexually assaulting business associates, but did nothing to stop his unlawful behavior.

43.    For example, in November 2015, Dinnis attended an event hosted by Rocketmiles, a hotel booking company.  He became intoxicated in front of employees of Rocketmiles and Virgin.  He grabbed the buttocks of a female Rocketmiles employee, then followed her into an Uber and attempted to grope her again.  The woman demanded Dinnis exit the vehicle and told the driver not to leave until he had or she would call the police.  Dinnis stumbled out of the car.

44.    Then, in mid-2016, Dinnis and a group of Virgin employees attended meetings at the Rocketmiles office in Chicago.  That evening, Dinnis once again drank to excess and became sexually aggressive with two female employees of Rocketmiles, and made a lewd comment to a woman attending the event with a friend.  He grabbed two women's buttocks.  The CEO and CFO of Rocketmiles saw the offending conduct and demanded that Dinnis leave the premises.  The following day, other Virgin employees apologized for Dinnis' conduct and mentioned that Dinnis had issues with drinking and respecting boundaries with women.

45.     Despite actual knowledge of Dinnis' history of witnessed sexual assaults, Virgin did nothing to prevent the foreseeable attack on Plaintiff.  Dinnis regularly carried out his predatory acts during networking business events and within the course and scope of his employment duties.  Virgin could have, and should have done more to supervise, train and discipline Dinnis, and to protect Plaintiff.

46.     At the time Dinnis assaulted Plaintiff, Virgin knew or should have known that he was unfit to work with women in the travel industry, and that he posed a particular risk of sexually harassing and assaulting them.  Virgin's negligence in failing to discipline Dinnis was a substantial factor in causing harm to Plaintiff.

47.     At all times relevant, Dinnis acted as an agent of Virgin.  Dinnis attended the functions where these events occurred in furtherance of, and for the benefit of, Virgin's business.  Virgin paid his travel and accommodation expenses for the Mega Loyalty Event.  He was expected to attend networking events and hold business meeting with key partners of the loyalty program, including during the Mega Loyalty Conference.  His conduct at the networking events was broadly incidental to the enterprise undertaken by Virgin.

48.     The incidents alleged herein were an outgrowth of Dinnis' employment with Virgin and the risk of tortious injury presented by Dinnis' behavior at these events was inherent in the working environment.  Dinnis' motivation was an outgrowth of his workplace responsibilities, conditions or events.  Consumption of alcohol at these types of events was a customary incident to Dinnis' employment with Virgin and was tolerated and ratified, if not encouraged, by Virgin.  At a minimum, Virgin was aware of the consumption of alcohol during these types of events, and Dinnis' drinking to excess was foreseeably within the course and scope of his employment.

49.     Dinnis' conduct was willful, and was undertaken in conscious and/or reckless disregard of the safety of others, including Plaintiff.  This constitutes malice as defined by Civil Code section 3294.  Dinnis had actual or constructive knowledge that his actions would result in injury and/or serious emotional harm, and the harm inflicted upon Plaintiff was a probable result of the peril presented by his actions.  Plaintiff is entitled to an award of punitive/exemplary damages against Dinnis.

50.     The conduct alleged against the Airline Defendants was willful and was undertaken in conscious and/or reckless disregard of the safety of others, include Plaintiff.  This constitutes malice as defined

by Civil Code section 3294.  The Airline Defendants had actual or constructive knowledge that Dinnis' predation was a potential peril to women in the travel industry, and that injury and/or serious emotional harm, was a probable result of the peril presented by their actions in failing to supervise and/or discipline Dinnis.  The Airline Defendants consciously failed to act to avoid the peril.  Plaintiff is entitled to an award of punitive/exemplary damages against the Airline Defendants.

**FIRST CAUSE OF ACTION**
**Negligent Supervision and Retention**
**(Against the Airline Defendants)**

51.     Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

52.     Virgin hired Dinnis, and at the time of the events alleged herein, employed him as a Director.

53.     The Airline Defendants owed Plaintiff and the general public a duty of reasonable care in the hiring, training and supervision of its employees.

54.     At all times relevant, Dinnis was acting within the course and scope of his employment.

55.     Dinnis was unfit or incompetent to work directly with women and posed a particular risk of sexually harassing and assaulting them.

56.     The Airline Defendants knew or should have known not only that Dinnis was unfit or incompetent to work directly with women and posed a particular risk of sexually harassing and assaulting them, but also that this unfitness created a particular risk to Plaintiff.

57.     Dinnis' known unfitness and incompetence, and his particular risk of sexually assaulting women, visited harm upon Plaintiff.

58.     As a direct and proximate result of the conduct alleged herein, Plaintiff sustained pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment, humiliation, and loss of income.

59.     The Airline Defendants' negligence in supervising and/or retaining Dinnis was a substantial factor in causing harm to Plaintiff.

60.     The Airline Defendants employed Dinnis with a conscious disregard of the rights of safety of others, so as to warrant the imposition of punitive damages pursuant to California Civil Code § 3294.

61.     Plaintiff requests relief as hereinafter provided.

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against all Defendants)

62.     Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

63.     Dinnis' extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

64.     Dinnis' outrageous conduct was not the type of ordinary rude or obnoxious behavior that any person should be expected to tolerate.  Rather, Dinnis' conduct exceeded all possible bounds of decency.

65.     Dinnis acted with intent or recklessness, knowing that Plaintiff was likely to suffer emotional distress, and with deliberate disregard of same.

66.     Dinnis' conduct caused severe emotional distress and suffering for Plaintiff at levels that no reasonable person should have to endure.

67.     As a direct and proximate result of Dinnis' conduct, Plaintiff sustained pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment, humiliation, and loss of income. Dinnis' conduct was a substantial factor in causing Plaintiff's severe emotional distress.

68.     The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the scope of his employment.  A causal nexus existed between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.

69.     Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

70.     Plaintiff requests relief as hereinafter provided.

**THIRD CAUSE OF ACTION**
**Negligent Infliction of Emotional Distress**
**(Against all Defendants)**

71.     Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

72.     Dinnis' conduct negligently caused serious emotional distress to Plaintiff.

73.     Dinnis could reasonably foresee that his action would have caused emotional distress to Plaintiff.

74.     Plaintiff was in a specific zone of danger in the elevator and the hotel hallway, and at risk of physical harm, causing her fear.

75.     Plaintiff immediately suffered distress and emotional harm brought on by Dinnis' actions, which were a substantial factor in causing said distress.

76.     As a direct and proximate result of Dinnis' conduct, Plaintiff sustained pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment, humiliation, and loss of income. Dinnis' conduct was a substantial factor in causing Plaintiff's severe emotional distress.

77.     The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the course and scope of his employment. A causal nexus existed between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.

78.     Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

79.     Plaintiff requests relief as hereinafter provided.

**FOURTH CAUSE OF ACTION**
**Assault**
**(Against all Defendants)**

80.     Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

81.   Dinnis intended to cause apprehension of harmful or offensive conduct against Plaintiff.

82.   Dinnis' actions did, in fact, cause Plaintiff to fear imminent harmful or offensive contact.

83.   Plaintiff did not consent to Dinnis' conduct.

84.   Plaintiff's reaction was the same of that of a reasonable person.

85.   Plaintiff was harmed by the apprehension created by Dinnis' conduct, and Dinnis' conduct was a substantial factor in causing that harm.

86.   The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the course and scope of his employment. A causal nexus existed between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.  Each act of battery carried out by Dinnis was foreseeable given Dinnis' known history of assaulting women in work settings.

87.   Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

88.   Plaintiff requests relief as hereinafter provided.

## FIFTH CAUSE OF ACTION
### Battery
### (Against all Defendants)

89.   Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

90.   Dinnis intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Ms. Marwood.

91.   Dinnis committed unwanted contact with Plaintiff's person in a harmful or offensive manner, including but not limited to causing sexual contact between himself and Plaintiff.

92.   Plaintiff did not consent to the contact.

93.   Dinnis' battery of Plaintiff caused harm, including physical, mental, and/or emotional harm.

94.   A reasonable person would have been offended by the contact.

95.   The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the course and scope of his employment with the Airline Defendants.  A causal nexus between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.  Each act of battery carried out by Dinnis was foreseeable given Dinnis' known history of assaulting women in work settings.

96.   Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

97.   Plaintiff requests relief as hereinafter provided.

## SIXTH CAUSE OF ACTION
### Violation of California Government Code § 12940(k)
### (Against the Airline Defendants)

98.   Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

99.   California Government Code § 12940(k) provides a right of action when an employer "fail[s] to take all reasonable steps necessary to prevent discrimination and harassment from occurring."

100.   The Airline Defendants, which knew or should have known about Dinnis' propensity to sexually harass and assault women working in the travel industry failed to discipline, train and/or fire Dinnis before he sexually assaulted Plaintiff.

101.   Plaintiff was harmed as a result of that failure.

102.   Plaintiff requests relief as hereinafter provided.

## SEVENTH CAUSE OF ACTION
### Violation of California Civil Code § 51.7(a)
### (Against all Defendants)

103.   Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

104.   California Civil Code § 51.7(a) states: "All persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of political affiliation, or on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51."

105.   California Civil Code § 51(b) provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

106.   California Civil Code § 51(e) provides: "For purposes of this section: (1)"Disability" means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code. (2)"Medical condition" has the same meaning as defined in subdivision (h) of Section 12926 of the Government Code.  (3)"Religion" includes all aspects of religious belief, observance, and practice. (4)"Sex" has the same meaning as defined in subdivision (p) of Section 12926 of the Government Code. (5)"Sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation" includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories.  (6)"Sexual orientation" has the same meaning as defined in subdivision (q) of Section 12926 of the Government Code."

107.   Through his actions alleged herein, Dinnis committed violence, or intimidation by threat of violence, against Plaintiff.  In doing so, Dinnis violated the civil rights of Plaintiff.

108.   Plaintiff was harmed as a result of those actions.

109.   The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the course and scope of his employment. A causal nexus existed between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.  Each act of battery carried out by Dinnis was foreseeable given Dinnis' known history of assaulting women in work settings.

110.   Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

111.   Plaintiff requests relief as hereinafter provided.

### EIGHTH CAUSE OF ACTION
**Violation of California Civil Code § 52.1**
**(Against all Defendants)**

112.   Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

113.   At all times relevant, Article I, Seciton 8 of the California Constitution was in full force and effect and binding on Defendants.  Pursuant thereto, Plaintiff has the right to be free from violence, threats of violence and intimidation.

114.   As alleged herein, Dinnis interfered with, or attempted to interfere with, Plaintiff's peaceable exercise and enjoyment of said rights by threats, intimidation or coercion.

115.   In so doing, Dinnis violated the civil rights of Plaintiff, as set forth in California Civil Code § 52.1.

116.   Plaintiff was harmed as a result of those actions.

117.   The Airline Defendants are liable for the actions of its employees under the doctrine of *respondeat superior*.  Dinnis' conduct was committed within the course and scope of his employment. A causal nexus existed between (i) Dinnis' interaction with women working in the travel industry and (ii) his abuse of power to sexually harass them, including Plaintiff.  Each act of battery carried out by Dinnis was foreseeable given Dinnis' known history of assaulting women in work settings.

118.   Dinnis' conduct is not so unusual that it would seem unfair to include the loss resulting from it among other costs of the Airline Defendants' business.  As such, holding the Airline Defendants liable furthers the policy goals of *respondeat superior*, including the prevention of future assaults by employees of the Airline Defendants.

119.   Plaintiff requests relief as hereinafter provided.

## NINTH CAUSE OF ACTION
### Violation of California Civil Code § 52.4
### (Against Dinnis)

120. Plaintiff hereby incorporates and realleges each and every preceding paragraph of this Complaint as if the same were set forth at length herein.

121. California Civil Code § 52.4(c)(2) prohibits "gender violence," including "a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, prosecution, or conviction."

122. Dinnis perpetrated a "physical intrusion or invasion of asexual nature under coercive conditions" against Plaintiff.

123. Plaintiff was harmed as a result of those actions.

124. Plaintiff requests relief as hereinafter provided.

## RELIEF REQUESTED

WHEREFORE Plaintiff prays for judgment against Defendants as follows:

a. All actual, compensatory, liquidated, consequential and general damages, including but not limited to damages for emotional distress, humiliation, embarrassment, anguish, and loss of income, according to proof;

b. Exemplary and punitive damages in an amount commensurate with Defendants' ability to pay and deter future conduct to the extent allowable by law;

c. Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law (including pursuant to California Civil Code §§ 52.1(h) and 52.4(a));

d. Statutory damages to the extent allowable by law (including pursuant to 52(b)(2));

e. Pre-judgment and post-judgment interest, as provided by law; and

f. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

DATED: April 23, 2018

By: _____ */s/ Lori E. Andrus*_____
Lori E. Andrus

Lori E. Andrus (SBN 205816)

lori@andrusanderson.com
Jennie Lee Anderson (SBN 203586)
jennie@andrusanderson.com
**ANDRUS ANDERSON LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone:   (415) 986-1400
Facsimile:   (415) 986-1474

*Attorneys for Plaintiff*

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2    Plaintiff hereby demands a jury trial in this action for all claims so triable.

3  DATED: April 23, 2018

4                                          By: _____
                                                    Lori E. Andrus
5

6    Lori E. Andrus (SBN 205816)
     lori@andrusanderson.com
7    Jennie Lee Anderson (SBN 203586)
     jennie@andrusanderson.com
8    **ANDRUS ANDERSON LLP**
     155 Montgomery Street, Suite 900
9    San Francisco, CA 94104
     Telephone:   (415) 986-1400
10   Facsimile:   (415) 986-1474

11   *Attorneys for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28