PAGES 1 – 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE DONNA M. RYU

JANE DOE,                              )
                                       )
            PLAINTIFF,                 )
                                       )
  VS.                                  ) NO. 18-CV-02420 DMR
                                       )
VIRGIN AMERICA, INC, AND ALASKA        )
AIR GROUP, INC.,                       )
                                       ) OAKLAND, CALIFORNIA
            DEFENDANT                   ) THURSDAY
                                       ) SEPTEMBER 13, 2018
_____)


**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  11:18 A.M. – 12:10 P.M.**

**APPEARANCES:**

**FOR PLAINTIFF**          ANDRUS ANDERSON LLP
                           155 MONTGOMERY STREET, SUITE 900
                           SAN FRANCISCO, CALIFORNIA 94104
                     **BY:  LORI ERIN ANDRUS, ESQUIRE**



**FOR DEFENDANT**          CORNERSTONE LAW GROUP
                           351 CALIFORNIA STREET
                           SUITE 600
                           SAN FRANCISCO, CALIFORNIA 94104
                     **BY:  PAUL BYRNE, ESQUIRE**


*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
*                 RETIRED OFFICIAL COURT REPORTER, USDC*

```
 1   THURSDAY, SEPTEMBER 13, 2018                    11:18 A.M.
 2   (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO
 3   IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER
 4   ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)
 5                           ---O0O---
 6                          PROCEEDINGS
 7        THE CLERK:   C-18-2420 DMR AND C-18-5393 DMR, DOE
 8   VERSUS VIRGIN AMERICA, INCORPORATED, ET AL. AND DOE VERSUS
 9   DINNIS.
10        PLEASE STATE YOUR APPEARANCES, COUNSEL.
11        MR. BYRNE:   GOOD MORNING, YOUR HONOR.  PAUL BYRNE
12   FROM CORNERSTONE LAW GROUP ON BEHALF OF DEFENDANTS VIRGIN
13   AMERICA INC., AND ALASKA AIR GROUP INC., AND I'M JOINED IN THE
14   GALLERY TODAY BY DAVID BEYER FROM ALASKA AIR GROUP.
15        THE COURT:   OKAY.  GOOD MORNING.
16        MS. ANDRUS:   GOOD MORNING, YOUR HONOR.  LORI ANDRUS
17   ON BEHALF OF PLAINTIFF.
18        THE COURT:   GOOD MORNING.
19        OKAY.  SO WE'RE HERE ON A COUPLE OF THINGS.  ONE IS
20   THE MOTION TO DISMISS IN THE CASE AGAINST VIRGIN AND ALASKA,
21   AND THEN WE HAVE A CMC IN THAT CASE AS WELL, AND THEN A CMC IN
22   THE CASE THAT WE SEVERED AND IS PROCEEDING AGAINST JUST
23   MR. DINNIS.
24        SO I'M GOING TO GO THROUGH THE MOTION FIRST, OKAY?
25   AND THEN WITH WE'LL TURN TO THE CMC FIRST THING.
```

1          SO, FIRST THING, MS. ANDRUS, THIS IS AN

2     ADMINISTRATIVE MATTER, BUT I WOULD LIKE YOU TO TAKE CARE OF

3     THIS.  IN ORDER TO PROCEED AS A DOE, YOUR CLIENT NEEDS TO FILE

4     A MOTION AND SUPPORT IT.  SO WHEN CAN YOU DO THAT BY?

5          **MS. ANDRUS:**  I ACTUALLY BROUGHT A MOTION WITH ME

6     TODAY, YOUR HONOR, AND A PROPOSED ORDER.  I CAN HAND YOU A COPY

7     OF IT NOW.  I'VE SHARED A COPY WITH DEFENSE COUNSEL.  DEFENSE

8     COUNSEL HAS ADVISED THEY WILL NOT OPPOSE THE ADMINISTRATIVE

9     MOTION.

10         SO MY APOLOGIES FOR NOT HAVING TAKEN CARE OF THIS

11    PREVIOUSLY, BUT IT JUST BECAME OBVIOUS TO ME WHEN PREPARING FOR

12    TODAY'S CMC THAT IT HADN'T BEEN DONE.  SO I DO WANT TO TAKE

13    CARE OF IT IMMEDIATELY.

14         **THE COURT:**  OKAY, GREAT.  I THINK THE BEST WAY TO

15    DEAL WITH IT IS FOR YOU TO GO AHEAD AND FILE IT.

16         **MS. ANDRUS:**  OKAY.

17         **THE COURT:**  AND THEN IF YOU WOULD LIKE TO FILE A

18    NON-OPPOSITION STATEMENT, THAT WOULD BE TERRIFIC, OR IT COULD

19    BE BY STIPULATION, EITHER WAY.  THAT'S GREAT.

20         **MS. ANDRUS:**  SURE.

21         **THE COURT:**  I THINK WE'LL -- I'LL JUST GO AHEAD AND

22    PROCEED ON A DOE BASIS BECAUSE I KNOW THAT YOU'VE GOT THE

23    MOTION READY TO BE FILED.

24         **MS. ANDRUS:**  OKAY.

25         **THE COURT:**  AND THERE'S NO NEED TO USE HER NAME

```
 1   ANYWAY, SO...
 2         MS. ANDRUS:  THANK YOU, YOUR HONOR.
 3         MR. BYRNE:  AGREED.
 4         THE COURT:  OKAY.  GREAT.  LET ME START WITH A
 5   CONFIRMATION.
 6         MR. BYRNE, THERE WERE, I THINK, A TYPO IN THE MOTION.
 7   I THINK YOUR CLIENTS ARE NOT CHALLENGING CLAIM 1, WHICH IS THE
 8   THEORY OF DIRECT NEGLIGENCE, NEGLIGENT SUPERVISION, NEGLIGENT
 9   RETENTION, NEGLIGENT --
10         MR. BYRNE:  THAT IS CORRECT, YOUR HONOR.
11         THE COURT:  OKAY.
12         MR. BYRNE:  THAT IS CORRECT.
13         THE COURT:  SO WE'RE REALLY TALKING ABOUT THE CLAIMS
14   THAT ARE PLEADED ON A THEORY OF VICARIOUS LIABILITY AND ALSO
15   THE UNRUH ACT AND THE BANE ACT.
16         MR. BYRNE:  CORRECT.
17         THE COURT:  SO ALL THE OTHER CLAIMS?
18         MR. BYRNE:  CORRECT.
19         THE COURT:  SO, MS. ANDRUS, LET ME START WITH THE
20   ISSUE OF EXTRATERRITORIALITY.  THE DEFENSE HAS ARGUED THAT THE
21   COMPLAINT IS REALLY CALLING FOR EXTRATERRITORIAL APPLICATION OF
22   THE UNRUH ACT AND THE BANE ACT.  AND UNDER SULLIVAN, THE COURT
23   HAS TO ANALYZE THAT BY LOOKING AT WHERE THE CONDUCT THAT
24   CREATES THE LIABILITY OCCURS.
25         SO, IN YOUR OPPOSITION PAPERS, YOU SAY THAT THE
```

```
 1    CONDUCT AT ISSUE WAS THE DECISION BY VIRGIN TO SEND DINNIS TO
 2    TORONTO AND THAT OCCURRED IN CALIFORNIA.  SO TWO PROBLEMS WITH
 3    THAT.  ONE, IT'S NOT PLEADED.  IT'S NOT THE COMPLAINT.
 4              MS. ANDRUS:  WOULD YOU LIKE ME TO RESPOND NOW?
 5              THE COURT:  SURE.  GO AHEAD AND POINT IT OUT TO ME.
 6              MS. ANDRUS:  OKAY.
 7              THE COURT:  GO AHEAD.
 8              MS. ANDRUS:  LORI ANDRUS ON BEHALF OF PLAINTIFF, YOUR
 9    HONOR.
10              IN COMPLAINT PARAGRAPH NUMBER 47, WE SAY THAT DINNIS
11    WAS EXPECTED TO ATTEND NETWORKING EVENTS AND HOLD BUSINESS
12    MEETINGS WITH KEY PARTNERS OF THE COMPANY'S LOYALTY PROGRAM.
13    IN THE SAME PARAGRAPH WE SAY, TO THAT END, VIRGIN PAID DINNIS'S
14    TRAVEL AND ACCOMMODATION EXPENSES FOR THE SUBJECT CONFERENCE.
15              AND WE ALSO SAY THAT IN PARAGRAPH 47, THAT VIRGIN
16    PAID ALL OF DINNIS'S EXPENSES ASSOCIATED WITH THE CONFERENCE
17    INCLUDING FOR EXCESSIVE AMOUNTS OF ALCOHOL.
18              THOSE ALLEGATIONS, YOUR HONOR, COUPLED WITH THE
19    UNCONTESTED ALLEGATIONS OF VIRGIN'S CORPORATE HEADQUARTERS
20    BEING LOCATED HERE IN THIS DISTRICT AND THAT HE WAS EMPLOYED
21    HERE, HE WAS A RESIDENT HERE, SEEM TO ME TO BE SUFFICIENT FOR
22    PURPOSES OF RULE 12(B)(6).
23              THE COURT:  I DON'T -- I DON'T THINK THEY ARE, NUMBER
24    ONE.
25              MS. ANDRUS:  OKAY.
```

1          **THE COURT:**  I DON'T THINK THEY ARE.  I THINK THEY'RE

2     IMPLICIT AT BEST AND KIND OF A STRETCH.  I MEAN, WHAT YOU'RE

3     TRYING TO DO HERE IS -- IT'S MISSING WORDS ABOUT WHERE THAT

4     DECISION WAS MADE.  WHERE WAS THAT DECISION MADE, BECAUSE

5     THAT'S YOUR THEORY OF WHY WE GET TO LOOK -- YOU KNOW, HAVE AN

6     UNRUH AND BANE ACT CLAIM HERE.

7          BUT I WILL SAY THAT EVEN IF YOU WERE GRANTED LEAVE TO

8     AMEND TO PUT THAT IN -- AND I WOULD GRANT LEAVE TO AMEND,

9     BECAUSE THE NINTH CIRCUIT REQUIRES LIBERAL PLEADING -- THE

10    PROBLEM IS -- AND I DIDN'T LOOK INTO IT BECAUSE, YOU KNOW, IT'S

11    ADVISORY, AND MAYBE THERE'S ANOTHER ROUND, BUT YOU WILL NEED TO

12    LOOK INTO IT IN AMENDING THE PLEADING.

13         I'M NOT SURE THAT'S ENOUGH TO GET PAST *SULLIVAN*

14    BECAUSE WE HAVE TO LOOK AT -- UNDER *SULLIVAN* YOU LOOK AT, YOU

15    KNOW, WHETHER EXTRATERRITORIAL APPLICATION WAS CLEARLY

16    EXPRESSED IN SOME -- IN THE LANGUAGE OR IN THE HISTORY, ET

17    CETERA, OF THE STATUTE.  SO I DIDN'T GO THROUGH AND MAKE THAT

18    ANALYSIS BECAUSE IT'S NOT IN THE PLEADING RIGHT NOW, BUT I

19    WOULD GIVE YOU LEAVE TO AMEND TO DO IT IF YOU THINK YOU COULD

20    DO IT IN A WAY CONSISTENT WITH RULE 11 GIVEN *SULLIVAN*.

21         **MS. ANDRUS:**  OKAY.

22         **THE COURT:**  OKAY?

23         **MS. ANDRUS:**  MAY I RESPOND?

24         **THE COURT:**  SURE.

25         **MS. ANDRUS:**  THANK YOU, YOUR HONOR.  LORI ANDRUS

1    SPEAKING AGAIN HERE.

2              *SULLIVAN* WAS DECIDED AT SUMMARY JUDGMENT STAGE AND SO

3    IT'S A DIFFERENT STANDARD.  AND FOR -- SO TO MEET THE PLEADING

4    STANDARD HERE AT THE 12(B)(6) STAGE, I COULD, YOU KNOW, DO MY

5    BEST TO BOLSTER THE ALLEGATIONS, MAKE IT EXPLICIT, AS YOU SAY,

6    THAT WE BELIEVE THOSE DECISIONS WERE MADE HERE IN CALIFORNIA,

7    BUT IT'S TRULY ON INFORMATION AND BELIEF.

8              WE HAVEN'T HAD THE OPPORTUNITY TO DO DISCOVERY.  AND

9    SO UNTIL WE ARE ABLE TO EXPLORE EXACTLY HOW MUCH THEY KNEW

10   ABOUT THIS EMPLOYEE'S PROPENSITY TO SEXUALLY ASSAULT WOMEN, HOW

11   MUCH THEY KNEW ABOUT HIS MISUSE OF ALCOHOL AND EXCESSIVE

12   CONSUMPTION OF ALCOHOL, AND WHETHER THEY RATIFIED THAT

13   BEHAVIOR, ALL OF THAT IS REALLY RELEVANT TO THE QUESTION OF

14   WHETHER THE AIRPLANE DEFENDANTS CAN BE HELD RESPONSIBLE UNDER

15   THE UNRUH ACT, AND SO WITHOUT THE AID OF DISCOVERY, IT MAY NOT

16   BE POSSIBLE FOR ME TO GIVE YOU THE ROBUST ALLEGATIONS THAT YOU

17   DESIRE.

18             **THE COURT:**  I DON'T THINK WE'RE TALKING ABOUT THE

19   SAME THING.

20             **MS. ANDRUS:**  OKAY.

21             **THE COURT:**  SO ON PLEADING, YES, YOU CAN PLEAD ON

22   INFORMATION AND BELIEF MANY THINGS.  I DON'T KNOW IF THIS IS

23   ONE OF THE THINGS YOU ARE ALLOWED TO DO THAT.  THAT'S NOT MY

24   CONCERN.

25             LET'S SAY YOU WERE ABLE TO PLEAD ROBUSTLY OR NOT THE

1    KINDS OF THINGS YOU'RE MENTIONING, I'M STILL NOT SURE THAT THAT

2    MEETS THE REQUIREMENTS OF THE ANALYSIS ABOUT WHETHER IT CAN BE

3    APPLIED ON AN -- WHETHER THIS WAS AN IMPROPER EXTRATERRITORIAL

4    APPLICATION OF THOSE ACTS, AND THAT'S SOMETHING THAT CAN BE

5    DECIDED AT THE PLEADING STAGE.

6          SO YOU HAVE TO LOOK AT UNRUH.  YOU NEED TO LOOK AT

7    BANE, AND LOOK AT THOSE STATUTES, AND IS IT MEANT TO CAPTURE

8    WHERE THE CONDUCT -- YOU KNOW, IS UNRUH AND BANE GEARED TOWARD

9    THE CONDUCT THAT DINNIS ALLEGEDLY ENGAGED IN IN TORONTO, OR CAN

10   IT -- CAN THE CONDUCT BE THE DECISION MAKING BACK IN

11   CALIFORNIA.  THAT'S SOMETHING THAT NEEDS TO BE TEASED OUT AND

12   NEEDS TO BE DONE -- I THINK CAN PROPERLY BE DONE AT THIS STAGE.

13         BUT, YOU KNOW, YOU CAN LOOK INTO IT.  AS I SAID, I

14   DIDN'T DO A FULL ANALYSIS BECAUSE I SAW A BASIC PROBLEM AT THE

15   OUTSET.  OKAY?

16         **MS. ANDRUS:**  OKAY.  THANK YOU, YOUR HONOR.

17         I WOULD ALSO ASK, THOUGH, THAT WE CONSIDER THE

18   HOLDING OF *BELIVEAU V. CARAS*, WHICH IS A CENTRAL DISTRICT OF

19   CALIFORNIA CASE THAT ALLOWED AN UNRUH ACT RESPONDEAT SUPERIOR

20   THEORY TO PROCEED AND HELD IT COULD NOT BE DISMISSED AT THE

21   PLEADING STAGE AND SINCE WE HAVE ALLEGATIONS -- OR WE'RE

22   PURSUING MORE THAN ONE THEORY AGAINST THE AIRLINE DEFENDANTS;

23   RESPONDEAT SUPERIOR, VICARIOUS LIABILITY, BUT ALSO DIRECT

24   LIABILITY, BECAUSE WE ALLEGE, AND I THINK SUFFICIENTLY ALLEGE,

25   THAT HE WAS ACTING AS THEIR AGENT IN CARRYING OUT THESE ACTS.

1          SO IT WOULD BE OUR ARGUMENT THAT AS -- THE AIRLINE

2    DEFENDANTS' AGENT, THEY ARE RESPONSIBLE REGARDLESS OF WHERE IT

3    HAPPENS.  AND I DON'T KNOW THAT THERE IS A CASE DIRECTLY ON

4    POINT UNDER THESE ADMITTEDLY COMPLEX FACTS BUT, YOU KNOW, IF

5    IT'S YOUR HONOR'S ORDER TO AMEND THE COMPLAINT, WE WILL DO OUR

6    BEST, AND WE CAN REVISIT THE ISSUE.

7          **THE COURT:**  I'LL TAKE A LOOK AT IT, BUT THAT'S WHERE

8    I'M HEADING.

9          **MS. ANDRUS:**  OKAY.

10          **THE COURT:**  BUT THERE WOULD BE -- YOU KNOW, YOU WOULD

11    GET ANOTHER ATTEMPT AT AMENDING TO DEAL WITH THAT WITH RESPECT

12    TO UNRUH AND BANE.

13          DO YOU WANT TO BE HEARD ON THIS?

14          **MR. BYRNE:**  YOUR HONOR, REALLY, I WOULD BE ARGUING

15    PRETTY MUCH ECHOING WHAT THE COURT HAS SAID, BUT I WILL

16    EMPHASIZE THAT THE CONDUCT THAT PLAINTIFF IS DISCUSSING, THE

17    DECISION MAKING, WHATEVER PROCESS THAT OCCURRED IN CALIFORNIA,

18    THAT MIGHT HELP WITH A NEGLIGENT RETENTION, NEGLIGENT HIRING

19    CAUSE OF ACTION, BECAUSE THAT TOOK PLACE IN CALIFORNIA AND

20    THAT -- SHE DOES HAVE THAT CLAIM, IT'S NOT BEING CHALLENGED.

21          HOWEVER, IF YOU DO LOOK AT THE CASES, IN PARTICULAR

22    THE *PRECHT* CASE WHICH I'M SURE THE COURT REVIEWED, YOU KNOW,

23    THE CONDUCT THAT THE BANE AND UNRUH STATUTES MAKE ILLEGAL

24    OCCURRED IN CANADA.  YOU KNOW, GENDER VIOLENCE, INTIMIDATION,

25    THAT IS WHAT IS ILLEGAL ABOUT THOSE STATUTES, AND THAT IS

1  UNQUESTIONABLY WHAT HAPPENED IN TORONTO, NOT BACK IN

2  CALIFORNIA.  SO I AGREE WITH THE COURT IT'S GOING TO BE

3  DIFFICULT TO OVERCOME BASED ON *SULLIVAN VERSUS ORACLE*.

4          THE OTHER POINT I HAVE IS -- I'M NOT FAMILIAR WITH

5  THE CASE THAT PLAINTIFF'S COUNSEL HAS CITED, BUT I'M WILLING TO

6  BET THAT CONDUCT IN THAT PARTICULAR CASE TOOK PLACE IN

7  CALIFORNIA, NOT IN A SITUATION TAKING PLACE IN ANOTHER STATE OR

8  IN CANADA.  I COULD BE WRONG.  I'D HAVE TO READ THE CASE, BUT

9  THAT'S MY SUSPICION.

10          **THE COURT:**  OKAY.  I'LL TAKE, YOU KNOW, THIS PORTION

11  UNDER SUBMISSION, BUT I THINK I'M LIKELY TO ASK YOU TO AMEND,

12  AND, YOU KNOW, IN SO DOING YOU'LL FIGURE OUT WHAT THE LAW

13  REQUIRES, AND MAYBE WE'LL HAVE A ROUND TWO ON THE QUESTION OF

14  BANE AND UNRUH, BUT THAT'S WHERE I'M HEADED.

15          LET'S TALK ABOUT THE RESPONDEAT SUPERIOR ARGUMENT.

16  THIS HAS TO DO WHETHER DINNIS'S ALLEGED ASSAULTS OCCURRED

17  WITHIN THE SCOPE OF HIS EMPLOYMENT SUCH THAT DEFENDANTS CAN BE

18  RESPONSIBLE FOR THEM.

19          SO WHAT I'D SAY ON THIS ONE -- AND THIS IS REALLY

20  TOWARD YOU, MR. BYRNE -- THE LAW TELLS ME THAT THIS IS A

21  QUESTION OF FACT, AND, SO, AT THE PLEADING STAGE, UNLESS

22  THERE'S UNDISPUTED FACTS AND NO CONFLICTING INFERENCES, THIS

23  SHOULD REALLY GO FORWARD.  AND WHAT I'M SEEING IN THE

24  ALLEGATIONS HERE ARE THAT MS. ANDRUS HAS PLEADED THAT VIRGIN

25  SENT MR. DINNIS TO TORONTO TO THIS CONFERENCE TO DEVELOP

1  BUSINESS RELATIONSHIPS AND TO NETWORK WITH PEOPLE LIKE HER

2  CLIENT, AND THAT ALL OF THAT WAS BENEFITING VIRGIN, AND HE WAS

3  EXPECTED TO ATTEND AND HOLD MEETINGS WITH PEOPLE LIKE MS. DOE,

4  AND THAT THE CONSUMPTION OF ALCOHOL WAS CUSTOMARY AND INCIDENT

5  TO THAT ASPECT OF HIS EMPLOYMENT, AND, IN THIS CASE, THERE'S

6  PRIOR ACTS THAT ARE ALLEGED WITHIN, YOU KNOW, A YEAR OR LESS

7  WHERE HE -- WHERE MR. DINNIS, APPARENTLY IN AN INTOXICATED

8  STATE, ASSAULTED OTHER WOMEN WITH -- IN FRONT OF VIRGIN

9  EMPLOYEES.  SO WITH -- THE ALLEGATION IS WITH VIRGIN'S

10  KNOWLEDGE.

11          SO ON THAT CONSTELLATION OF FACTS, SURE SEEMS TO ME

12  LIKE WE HAVE PROBABLY DISPUTED FACTS, BUT ALSO CONFLICTING

13  INFERENCES, AND SO THAT'S KIND OF WHERE I'M HEADED ON THAT ONE,

14  BUT I'LL ALLOW YOU TO ARGUE.

15          **MR. BYRNE:**  NO.  THANK YOU, YOUR HONOR.  I

16  ANTICIPATED THIS FOR SURE.

17          THE COMPLAINT, OBVIOUSLY FOR THE MOTION TO DISMISS,

18  WE'RE TAKING ALL FACTS AS TRUE, AND ANY INFERENCES WOULD GO

19  TOWARDS PLAINTIFF.  SO I THINK THAT REALLY TAKES CARE OF THAT

20  ISSUE.

21          WE CAN THINK ABOUT, HYPOTHESIZE WHAT MAY COME IN

22  LATER, BUT THIS IS A VERY DETAILED COMPLAINT.  SO -- AND OTHER

23  COURTS HAVE DEALT WITH THIS AT THE PLEADING STAGE.  BUT,

24  REALLY, THE ARGUMENT IS THIS:  LET'S JUST ASSUME EVERYTHING

25  OBVIOUSLY IS TRUE.  EVEN UNDER THAT SCENARIO, THE BEST CASE

1    SCENARIO THAT THEY'RE LIKELY GOING TO GET AT THIS PLEADING

2    STAGE, AGAIN DETAILED COMPLAINT, EVEN UNDER THAT SCENARIO, THE

3    ACTIONS OF DINNIS WERE NOT WITHIN THE SCOPE OF HIS EMPLOYMENT

4    WITH HIS JOB DUTIES, WHICH, AS WE KNOW FROM *FARMERS* AND *LISA M.*

5    EXAMINATION, THERE'S TWO EXAMINATIONS, FORESEEABILITY POLICY

6    REASONS.

7              AND THEN THE FIRST IS, REALLY, WAS HIS SEXUAL

8    MISCONDUCT ANY WAY TYPICAL OF OR BROADLY INCIDENTAL TO HIS JOB

9    DUTIES, HIS PARTICULAR JOB DUTIES, HIS --

10             **THE COURT:**  I DISAGREE WITH THE WAY YOU JUST STATED

11   THE LAW ON THAT.  I MEAN, I AGREED WITH YOU UP TO THE VERY LAST

12   CLAUSE, AND I THINK THE LAW IS PRETTY CLEAR THAT -- I MEAN,

13   SEXUAL MISCONDUCT IS NOT PART OF ANYBODY'S JOB, BUT, CLEARLY,

14   THE CASES SAY IF SOMEBODY ENGAGES IN THAT, IT STILL CAN FALL

15   WITHIN THEIR SCOPE OF EMPLOYMENT.  SO THAT DOESN'T ANSWER THE

16   QUESTION.

17             **MS. ANDRUS:**  NO, IT DOESN'T, BUT, HOWEVER, IF YOU

18   LOOK AT SOMETHING LIKE *LISA M.* AND COMPARE IT TO OUR CASE -- IN

19   *LISA M.* YOU'VE GOT AN ULTRASOUND TECHNICIAN WHO IS TAKING IN A

20   PATIENT.  SHE'S PREGNANT.  HE'S EXAMINING HER FOR HOW HER

21   PREGNANCY IS DOING.

22             THE PLACE OF EMPLOYMENT, OBVIOUSLY, SHE COMES IN,

23   THAT CAN'T BE A FACTOR.  GIVES HIM OPPORTUNITY, THE COURT FOUND

24   THAT'S NOT A FACTOR IN SCOPE OF EMPLOYMENT WHETHER HE ACTED.

25   THEN HE GOES ON AFTER THE EXAMINATION, AS WE KNOW, AND SEXUALLY

1    MOLESTS HER.  AND THAT IN *LISA M.* FOUND THAT'S NOT A GOOD

2    SITUATION.  HOWEVER, THAT WAS NOT RELATED TO HIS PERFORMANCE OF

3    ACTUALLY EXAMINING THAT PATIENT WITH ULTRAEXAM -- ULTRASOUND

4    EXAMINATION.

5            SO THIS CASE IS SO FAR DIFFERENT FROM EVEN THAT.  I

6    MEAN, HERE YOU HAVE A SITUATION WHERE HE'S NOT LURING HER INTO

7    ANYTHING.  HE DIDN'T ASK HER TO COME TO THE CONFERENCE.  HE

8    DIDN'T ASK HER TO GET IN THE ELEVATOR.  HE PURSUED HER.  THIS

9    IS NOT A SITUATION WHERE HE'S USING ANY COERCIVE AUTHORITY, ANY

10   OTHER TYPE OF AUTHORITY, WHICH *UBER* LOOKED AT, AS WE KNOW.

11           THIS IS ALSO A SITUATION WHERE IF A -- AN ULTRASOUND

12   TECHNICIAN'S, IF THAT IS NOT RELATED TO HIS JOB

13   RESPONSIBILITIES, SHE IS PRETTY MUCH --

14       **THE COURT:**  BUT DON'T WE HAVE A POWER ISSUE, SO A

15   COERCION ASPECT TO THIS?  I MEAN, I THINK WHAT DOE ARGUES HERE

16   IS THAT MR. DINNIS HAD SOME POWER AND LEVERAGE AND AUTHORITY

17   OVER MS. DOE, BECAUSE SHE WAS TRYING TO GET VIRGIN'S BUSINESS.

18   VIRGIN WOULD BE A HUGE COUP TO MAKE THAT CONNECTION, AND

19   MR. DINNIS KNOWS THAT THAT GIVES HIM SOME LEEWAY IN HOW HE'S

20   GOING TO INTERACT WITH HER.

21           AND SO, YOU KNOW, I GUESS ONE WOULD ARGUE IT'S SORT

22   OF A HARVEY WEINSTEIN-TYPE POWER DIFFERENTIAL.

23       **MR. BYRNE:**  THAT'S A REALLY GOOD EXAMPLE.  FIRST OF

24   ALL, THEY WERE ALREADY PARTNERS.  THEY WERE ALREADY BUSINESS

25   PARTNERS.  THEY WERE ALREADY CLIENTS.  THAT'S PLED.  THEY WERE

```
1    PARTNERS ALREADY.  THE IDEA WAS TO SOLIDIFY THE PARTNERSHIP.

2            SECOND, THERE'S NOTHING PLEAD IN THIS COMPLAINT THAT

3    HE HAD ANY DECISION MAKING POWER OVER WHO -- WHICH CLIENTS WERE

4    GOING TO BE WITH VIRGIN OR NOT OR REMAIN WITH VIRGIN OR NOT.

5    ALL IT SAYS IS HE WAS A KEY PLAYER.  AND I THINK EVIDENCE WILL

6    COME OUT LATER THAT WILL SHOW THAT.  BUT, IN ANY EVENT, THAT'S

7    WHAT'S IN THE PLEADING.

8            SECOND OF ALL --

9            THE COURT:  JUST TO BE CLEAR --

10           MR. BYRNE:  YEAH.

11           THE COURT:  I'M NOT SURE, YOU KNOW, THAT THIS ISSUE

12   OF THE COERCIVE RELATIONSHIP, I'M NOT SURE THAT IT'S NECESSARY

13   FOR THE -- FOR THE RESPONDEAT SUPERIOR.  I MEAN, THERE'S

14   DIFFERENT ASPECTS OF THIS, RIGHT?  AND I AGREE WITH YOU THAT

15   LISA M. IS PROBABLY YOUR BEST CASE, AND I'M GOING TO HEAR FROM

16   MS. ANDRUS ON IT IN A MOMENT.  BUT WHAT ELSE DO YOU WANT TO SAY

17   ABOUT THIS?

18           MR. BYRNE:  REALLY, WHAT THE HARVEY WEINSTEIN

19   EXAMPLE, MATT LAUER, ANYONE YOU WANT TO PICK, GOES TO IS THE

20   CASE OF THE CAPITAL CITIES, DOE VERSUS CAPITAL CITIES, WHERE

21   YOU HAVE THE CASTING DIRECTOR WHO ABSOLUTELY CONTROLS THE

22   CAREER OF AN ACTOR AND GOES IN AND SAYS, I'M YOUR MANAGER, YOU

23   KNOW, YOU GET YOUR WORK THROUGH ME.  THAT WOULD BE A SITUATION

24   EXCLUSIVELY, RIGHT?  AND NOT ONLY GET YOUR WORK, BUT YOU DON'T

25   HAVE ANY WORK, I CAN GIVE YOU WORK OR NOT GIVE YOU WORK.
```

1    THAT'S MORE KNOWLEDGE AS TO WHAT YOU'RE TALKING ABOUT.

2            HERE IT'S A NON-EMPLOYEE.  THEY'VE NEVER MET BEFORE,

3    HE HAS NO CONTROL OVER HER CAREER AT HER OTHER COMPANY.  THEY

4    ARE ALREADY PARTNERS.  SO TO SAY -- SUGGEST THAT COMES WITHIN A

5    SPHERE OF COERCION OR EVEN A TRUST RELATIONSHIP, SUCH AS YOU

6    COULD ARGUE THAT THE ULTRASOUND TECHNICIAN SURE HAD A TRUST

7    RELATIONSHIP WITH A VULNERABLE PATIENT COMING IN FOR AN

8    EXAMINATION ON, YOU KNOW, THE STATUS OF HER PREGNANCY, WE HAVE

9    NOTHING CLOSE TO THAT.  AND *LISA M.*, BY THE WAY, FOUND THAT WAS

10   NOT ENOUGH OF A TRUST SITUATION TO CREATE THIS -- EITHER A

11   COERCION OR A RELATIONSHIP OF TRUST, WHICH YOU MIGHT FIND IN A

12   THERAPIST PATIENT SITUATION WHICH YOU CAN EXPECT.

13           SO THIS GOES FAR BEYOND -- IF THIS COURT WERE TO FIND

14   THAT AS PLED MR. DINNIS'S RELATIONSHIP WITH A NON-EMPLOYEE FROM

15   A COMPANY THAT WAS ALREADY A PARTNER TO VIRGIN WAS EITHER

16   COERCIVE OR A TRUST RELATIONSHIP, IT WOULD GO FAR BEYOND ANY

17   CASE -- ANY REPORTED CASE, OR UNREPORTED CASE, FOR THAT MATTER,

18   IN FINDING THE SCOPE OF EMPLOYMENT.

19           **THE COURT:**  OKAY.  I'M NOT SURE THAT -- MY LOOKING AT

20   THE CASES OR MY TENTATIVE ANALYSIS DIDN'T EVEN GET TO THIS

21   ISSUE OF WHETHER THERE'S A TRUST RELATIONSHIP OR NOT, AND I

22   THINK THE *XUE LU* CASE TELLS US WE ACTUALLY DON'T LOOK AT

23   VULNERABILITY.

24           **MR. BYRNE:**  THAT'S RIGHT.

25           **THE COURT:**  WE'RE LOOKING AT OTHER THINGS, RIGHT?

1          **MR. BYRNE:**  THAT'S RIGHT.

2          **THE COURT:**  SO ANYTHING ELSE YOU WANT TO ADD AT THIS

3     POINT?

4          **MR. BYRNE:**  YES, YOUR HONOR.

5          I WOULD JUST SAY THAT THE FACTS THAT YOU MENTION, THE

6     ALCOHOL CONSUMPTION, THE PRIOR ACTS, THOSE ALL GO TO A CLASSIC

7     FORESEEABILITY ANALYSIS WHICH WOULD BE APPROPRIATE UNDER

8     NEGLIGENCE, FOR INSTANCE, BUT WE KNOW FROM EVEN *FARMERS GROUP*,

9     *LISA M.*, EVEN *UBER* SUGGESTS THAT A FORESEEABILITY ANALYSIS FOR

10    RESPONDEAT SUPERIOR IS FAR DIFFERENT.  IT JUST LOOKS AT WHETHER

11    THE CIRCUMSTANCE OF THAT PARTICULAR EMPLOYMENT SHOULD REALLY

12    BEAR THE COSTS OF THAT ACTION, RIGHT?  AND SO WE REALLY

13    SHOULDN'T BE USING THOSE FACTS TO DETERMINE WHETHER OR NOT HE

14    ACTED WITHIN THE SCOPE OF EMPLOYMENT; THOSE FACTS:  NEGLIGENT

15    RETENTION, NEGLIGENT HIRING, YES, FORESEEABILITY YES, BUT IT'S

16    NOT A BUT-FOR CAUSE INDICATION.

17         **THE COURT:**  SORRY, MR. BYRNE.  CLARIFY.  WHEN YOU SAY

18    "THOSE FACTS" WHAT ARE YOU --

19         **MR. BYRNE:**  FACTS.

20         **THE COURT:**  -- SAYING I SHOULDN'T RELY ON?

21         **MR. BYRNE:**  THE FACTS PLED THAT THERE WAS PRIOR

22    KNOWLEDGE OF HIM GROPING ANOTHER FEMALE, PRIOR KNOWLEDGE OF HIM

23    CONSUMING EXCESSIVE AMOUNTS OF ALCOHOL, I.E., YOU KNOW, OVER

24    THE LIMIT, BECAUSE OBVIOUSLY IT'S LEGAL TO DRINK; ANY FACTS

25    THAT WOULD SUGGEST HE WAS SOME SEXUAL PREDATOR RUNNING AROUND

1    ACCOSTING WOMEN WILLY NILLY.  THOSE FACTS AREN'T USED IN ANY

2    CASE I'VE SEEN, ANYTHING LIKE THAT, TO EXAMINE FORESEEABILITY

3    UNDER A RESPONDEAT SUPERIOR ANALYSIS.

4         WHAT YOU DO LOOK AT IS WHETHER OR NOT IN THIS CASE

5    IT'S FORESEEABLE THAT MR. DINNIS AFTER GOING TO A CONFERENCE, A

6    WORK CONFERENCE OFFSITE TO MEET WITH NON-EMPLOYEES, WOULD WAIT

7    IN A HOTEL LOBBY, FOLLOW A NON-EMPLOYEE INTO AN ELEVATOR, HAVE

8    SEXUAL MISCONDUCT, IS THAT FORESEEABLE BASED ON HIS JOB, WHICH

9    IS TO CREATE BRAND LOYALTY FOR VIRGIN.

10        **MS. ANDRUS:**  BUT NOW WE'RE BACK TO THAT QUESTION

11   ABOUT CONFLICTING INFERENCES, RIGHT?  BECAUSE MS. ANDRUS WOULD

12   SAY -- I'M GUESSING -- YOU KNOW, YEAH, WHERE VIRGIN SENDS

13   DINNIS TO THIS -- YOU KNOW, FOR VIRGIN'S BENEFIT TO GO TO THIS

14   CONFERENCE AND HE'S EXPECTED TO INTERACT AND BE THE -- YOU

15   KNOW, THE GOOD BUSINESS CONNECTION THAT THE LOYALTY COMPANIES

16   WANT, THAT, YOU KNOW, MAYBE IT IS FORESEEABLE AND FAIR THAT

17   MISCONDUCT IN THAT CONTEXT SHOULD BE ALLOCATED TO VIRGIN.

18        SO, AGAIN, WE'RE -- THIS PLEADING -- I'M BACK TO THE

19   PLEADING ANALYSIS I HAVE TO -- THESE ARE RAISING QUESTIONS OF

20   FACT, AND THERE ARE CONFLICTING INFERENCES -- -- THAT'S --

21        **MR. BYRNE:**  WELL, LET'S -- AND I WON'T BELABOR THE

22   POINT.  I UNDERSTAND THE COURT'S POINT, AND IT IS A STRUGGLE.

23   A LOT OF COURTS STRUGGLE WITH IT, AS WE SEE FROM THE CASES, AND

24   THEY'RE REALLY HARD TO INTERPRET IF YOU REALLY TRY TO FIGURE IT

25   ALL OUT.

1          BUT I THINK WHEN YOU LOOK FROM A HIGHER LEVEL, THERE

2     ARE NO CASES THAT WOULD SHOW THAT SENDING SOMEONE TO AN OFFSITE

3     WORK CONFERENCE AND SEXUAL ASSAULT OCCURRING AT THE WORK

4     CONFERENCE WITH A NON-EMPLOYEE CAN FALL WITHIN THE SCOPE OF

5     EMPLOYMENT.  THERE REALLY ISN'T.

6          AND IF THERE WERE, MUCH LIKE THE LINE OF CASES ABOUT

7     TEACHERS, UNFORTUNATELY, MOLESTING STUDENTS WHERE THE SCHOOL

8     DISTRICT'S BEEN HELD LIABLE, THE POLICY RAMIFICATIONS OF SAYING

9     YOU CAN'T SEND PEOPLE TO WORK CONFERENCES BECAUSE THEY MIGHT

10    DRINK TOO MUCH AND ACCOST OTHER PEOPLE, REALLY WOULD DISSUADE

11    ANYBODY FROM GETTING TOGETHER IN NOT OFFSITE WORK AREAS.  I

12    MEAN, IT'S NOT LIKE THE *MARRIOTT VERSUS PURTON* CASE WHERE

13    YOU'VE GOT A COMPANY --

14              **THE COURT:**  THE HOLIDAY PARTY?

15              **MR. BYRNE:**  THE HOLIDAY PARTY.

16              **THE COURT:**  IT'S A LITTLE DIFFERENT.

17              **MR. BYRNE:**  YOU KNOW WHAT I MEAN?

18              **THE COURT:**  IT'S A LITTLE DIFFERENT, BUT THERE'S

19    ALWAYS NEW CASES.  THAT'S THE FUN PART OF THIS, WE HAVE TO

20    EXTRAPOLATE TO SEE HOW THESE THINGS APPLY.

21          NOW I'M GOING TO TURN TO MS. ANDRUS.  I THINK --

22              **MR. BYRNE:**  THANK YOU.

23              **THE COURT:**  -- I'VE GIVEN YOU AN OPPORTUNITY FOR YOUR

24    SAY, AND WE'LL COME BACK TO HEAR IF THERE'S ANY LAST WORDS.

25          BUT, YEAH, *LISA M.* IS A TOUGH ONE, AND IT SEEMS LIKE

1    A RETRENCHING FROM, I GUESS, IT'S *MARY M.*, AND IT'S HARD TO SEE

2    EXACTLY HOW TO READ THOSE TOGETHER, BUT TELL ME WHY AT THIS

3    STAGE YOUR CLIENT SHOULD GET THROUGH ON RESPONDEAT SUPERIOR.

4          **MS. ANDRUS:**   THANK YOU, YOUR HONOR.

5          AND I AGREE THAT THIS MOTION PRESENTS SOME REALLY

6    IMPORTANT QUESTIONS ABOUT HOW SOCIETY VIEWS AN EMPLOYER'S

7    RESPONSIBILITIES TO STOP KNOWN REPEAT OFFENDERS FROM SEXUALLY

8    ASSAULTING OTHERS EITHER IN THE WORKPLACE OR WHILE THEY ARE AT

9    WORK.  AND ALTHOUGH THERE ARE -- THERE IS A LINE OF CASES,

10   INCLUDING *LISA M.* -- MOST OF THESE CASES ARE 25 YEARS OLD,

11   PERHAPS WHEN THESE PROBLEMS WERE VIEWED UNDER A DIFFERENT LENS

12   OR THROUGH A DIFFERENT PRISM.

13         AND SO I RECOGNIZE THERE ARE SOME CASES THAT FOUND NO

14   LIABILITY FOR SEXUAL ASSAULTS IN THE EMPLOYMENT CONTEXT, BUT I

15   ALSO BELIEVE, YOUR HONOR, THAT THE LEGAL LANDSCAPE IS SHIFTING

16   SOMEWHAT, AND THAT'S PARTICULARLY TRUE NOW, AS YOU HAVE

17   IMPLIED, GIVEN THAT SOCIETY HAS A BETTER UNDERSTANDING OF THE

18   PERVASIVENESS OF SEXUAL HARASSMENT THAT WORKING WOMEN HAVE TO

19   PUT UP WITH.

20         AND SO THE QUESTION I THINK IS RIGHTLY BEING ASKED,

21   YOU KNOW, WHO IS RESPONSIBLE AND WHAT DO RESPONSIBLE

22   CORPORATIONS NEED TO DO TO PROTECT WOMEN FROM HARM, ESPECIALLY

23   WHEN WE'VE GOT A KNOWN OFFENDER WHO DRINKS TO EXCESS.  AND SO

24   THE *LISA M.* CASE, I THINK IMPORTANTLY, YOUR HONOR, WAS DECIDED

25   ON SUMMARY JUDGMENT, NOT AT THE PLEADING STAGE.

1             AND YOUR HONOR ABSOLUTELY IS RIGHT TO REFERENCE THE

2    *XUE LU* CASE.  YOU KNOW, WE'RE TALKING ABOUT A FIGHT IN A

3    KITCHEN BETWEEN A COUPLE OF CHEFS.  ONE THROWS HOT OIL ON THE

4    OTHER.  IT'S AN UNBELIEVABLE SET OF FACTS.  A POLICE OFFICER IS

5    INJURED IN THE MEANTIME, AND YET THE EMPLOYER WAS FOUND TO BE

6    RESPONSIBLE FOR THAT COOK'S ACTIONS, BASICALLY BECAUSE THEY

7    WERE INCIDENTAL TO HIS WORK.

8             AND I THINK JUDGE ILLSTON IMPORTANTLY RECOGNIZED IN

9    *DOE VERSUS UBER* THAT WE APPLY A FORESEEABILITY STANDARD.

10            AND SO THE QUESTION REALLY COMES DOWN TO:  WOULD IT

11   BE SO UNUSUAL, OR STARTLING, OR UNFAIR TO INCLUDE THE COSTS,

12   THE RESULTS OF THE LOSS THAT OCCURS AS A RESULT OF THE

13   EMPLOYEE'S ACTIONS AMONG THE OTHER COSTS OF THE EMPLOYER'S

14   BUSINESS.

15            **THE COURT:**  LET ME STOP YOU THERE FOR A COUPLE OF

16   THINGS.

17            **MS. ANDRUS:**  SURE.

18            **THE COURT:**  THE *XUE LU* CASE I WAS THINKING ABOUT WAS

19   THE IMMIGRATION OFFICER.

20            **MS. ANDRUS:**  OH, NO, I BELIEVE THAT'S *BILLINGS*, YOUR

21   HONOR.  WAIT.  DID I GET THEM MIXED UP?  YOU'RE RIGHT.  I'M SO

22   SORRY.  I JUST MIXED THEM UP IN MY HEAD.

23            SO THE BILLINGS CASE -- DID LET ME DOUBLE-CHECK.

24            **MR. BYRNE:**  I THINK IT'S *YAMAGUCHI* YOU'RE TALKING

25   ABOUT.

1              **MS. ANDRUS:**  OH, SORRY, YEAH.  IT'S *YAMAGUCHI* THAT

2     I'M TALKING ABOUT.

3              **THE COURT:**  ABOUT THE OIL, THE CHEFS AND THE OIL.

4              **MS. ANDRUS:**  THANK YOU.  THAT WAS QUITE HONORABLE.  I

5     WILL RECOGNIZE MY OPPOSING COUNSEL FOR HELPING ME REMEMBER THE

6     NAME OF THE CASE.

7              THE *YAMAGUCHI* CASE WAS HOT OIL.  *XUE LU* WAS THE

8     IMMIGRATION OFFICER, AND THE NINTH CIRCUIT FOUND THAT HE WAS

9     ACCOUNTING WITHIN THE COURSE AND SCOPE OF HIS EMPLOYMENT, EVEN

10    THOUGH WHAT HE WAS DOING WAS ILLEGAL AND COMPLETELY ODIOUS AND

11    INVIDIOUS, I THINK WERE THE WORDS THAT THEY USED.  HE WAS

12    ACCEPTING BRIBES.  HE WAS MOLESTING WOMEN, AND THOSE THINGS

13    WERE FOUND TO BE WITHIN THE COURSE AND SCOPE OF HIS EMPLOYMENT,

14    EVEN THOUGH, CLEARLY, THEY WERE NOT PART OF HIS JOB DUTIES.

15             **THE COURT:**  I THINK THAT AT LEAST FOR ONE OF THE

16    VICTIMS, *XUE LU*, THE MOLESTATION HAPPENED AT HER HOME.  DIDN'T

17    HE GO --

18             **MS. ANDRUS:**  YES, THAT'S CORRECT, YOUR HONOR.

19             **THE COURT:**  LET ME ASK YOU TO ADDRESS A POINT THAT

20    MR. BYRNE MADE THAT I THINK IS REALLY INTERESTING.

21             SO HE'S ABSOLUTELY RIGHT, THAT RESPONDEAT SUPERIOR,

22    WHEN WE LOOK AT -- WHEN WE TALK ABOUT FORESEEABILITY, THAT'S

23    REALLY DIFFERENT FROM FORESEEABILITY IN NEGLIGENCE, SO HE HAS

24    URGED ME TO NOT CONSIDER THE POINTS ABOUT PRIOR ACTS OR

25    ALCOHOL.

1          **MS. ANDRUS:**  YES, YOUR HONOR.  AND I BELIEVE *DOE*

2  *VERSUS UBER* ADDRESSED THAT SPECIFIC PROBLEM.  AIELLO WAS ONE OF

3  THE DEFENDANTS IN *DOE VERSUS UBER*.  HE HAD A HISTORY OF

4  DOMESTIC VIOLENCE.  AND JUDGE ILLSTON DEFINITELY CONSIDERED

5  THAT FACT THAT SHOULD HAVE BEEN KNOWN TO UBER BECAUSE THEY

6  SHOULD HAVE BEEN LOOKING INTO PEOPLE'S CRIMINAL BACKGROUNDS

7  BEFORE THEY WERE PUTTING WOMEN IN VULNERABLE POSITIONS

8  VIS-A-VIS THEIR EMPLOYEES.  SO THAT BEING, OF COURSE, A RECENT

9  NORTHERN DISTRICT CALIFORNIA CASE I BELIEVE IS DIRECTLY ON

10  POINT AND INDICATES AND SIGNALS THAT OLD CASES LIKE *LISA M.* AND

11  *FARMERS* ARE NOT DISPOSITIVE IN THIS KIND OF CASE.  I MEAN,

12  APPLIED TO THE FACTS OF THIS CASE, AND CERTAINLY NOT AT THE

13  PLEADING STAGE, YOUR HONOR.

14          AND THE *BILLINGS* CASE -- OH, YEAH.  THAT WAS THE FEMA

15  OFFICER -- YOUR HONOR, THERE'S ANOTHER NINTH CIRCUIT CASE THAT

16  I BELIEVE IS DIRECTLY ON POINT ON THIS ISSUE, AND THAT'S

17  *BILLINGS*.  THE FEMA OFFICER GOT INTO A SCUFFLE WITH A

18  PROTESTOR, AND THAT CLEARLY WASN'T WITHIN HER JOB DUTIES, BUT

19  IT WAS INCIDENTAL TO HER EMPLOYMENT, AND RESPONDEAT SUPERIOR

20  PREVAILED IN THAT CASE.

21          AND SO I THINK THOSE ARE IMPORTANT GUIDANCE FOR THE

22  COURT TO CONSIDER, BUT AS *DOE VERSUS UBER* SAYS, WE'RE BASICALLY

23  TALKING ABOUT IS THIS FORESEEABLE, AND HERE, YOU KNOW, THE

24  AIRLINE DEFENDANTS -- I'M SORRY.  YES, YOUR HONOR.

25          **THE COURT:**  IS IT FORESEEABLE FOR PURPOSES OF

1    RESPONDEAT SUPERIOR, WHICH IS DIFFERENT FROM NEGLIGENCE?  WOULD

2    YOU CONCEDE THAT THE LAW TELLS US WE CAN'T -- IT'S NOT THE SAME

3    FORESEEABILITY.

4              **MS. ANDRUS:**  SURE, BUT WE'RE PROCEEDING UNDER BOTH

5    THEORIES.  SO *DOE VERSUS UBER* DEALT WITH RESPONDEAT SUPERIOR.

6              **THE COURT:**  AND I BELIEVE THE CASE LAW TELLS US WHEN

7    WE'RE LOOKING AT RESPONDEAT SUPERIOR AND WE'RE APPLYING THESE

8    POLICY CONCERNS, WHEN WE USE THE WORD "FORESEEABILITY," WE'RE

9    USING IT A DIFFERENT WAY THAN WE USE IT WITH, YOU KNOW, THE

10   NEGLIGENCE RUBRIC.

11             **MS. ANDRUS:**  RIGHT.  AND ARE YOU REFERRING TO THE

12   THREE --

13             **THE COURT:**  YES.

14             **MS. ANDRUS:**  -- PRONGED -- RIGHT.

15             SO LIKELY TO PREVENT FUTURE INJURIES, I WOULD

16   CERTAINLY ARGUE THAT IT WILL BE -- IF AN AIRLINE WHO HAS

17   KNOWLEDGE, ACTUAL KNOWLEDGE, OF INEXCUSABLE ACTS, REPEATED

18   INEXCUSABLE ACTS, THAT THEY NEED TO ACT TO PREVENT FUTURE

19   INJURIES TO OTHERS.  THE SECOND FACTOR IS ASSURING COMPENSATION

20   TO THE VICTIMS.  WE WOULD MEET THAT HERE.  AND SPREADING THE

21   LOSSES CAUSED BY VIRGINS' ENTERPRISE EQUITABLY, I BELIEVE THAT

22   FACTOR WOULD BE MET AS WELL, YOUR HONOR.

23             AND ALTHOUGH DEFENDANT'S REPLY SAYS WE DIDN'T ADDRESS

24   THOSE FACTORS IN OUR BRIEF, WE DID.

25             **THE COURT:**  SO I'M SORRY.  IT'S NOT THE THREE.  IT'S

1    THIS NOTION OF WHETHER LOSSES ARE FAIRLY ATTRIBUTABLE TO AN

2    ENTERPRISE AND THOSE WHICH ARE FORESEEABLY RESULTING FROM

3    CONDUCT.  SO IT'S THAT WORD "FORESEEABLE" WHERE THERE'S SORT --

4    SORT OF A DEFINITIONAL PROBLEM.  THAT'S WHAT I WAS GETTING AT

5    IS --

6             **MS. ANDRUS:**  YES.

7             **THE COURT:**  -- I CAN'T JUST IMPORT FORESEEABILITY

8    FROM NEGLIGENCE LAW.  IT'S A DIFFERENT MEANING.

9             **MS. ANDRUS:**  I UNDERSTAND, YES, YOUR HONOR.  I DON'T

10   DISAGREE WITH THAT.

11            BUT, BASICALLY, THE QUESTION BOILS DOWN TO:  WOULD IT

12   BE SO UNUSUAL OR STARTLING THAT IT WOULD BE SO UNFAIR TO HOLD

13   VIRGIN ACCOUNTABLE FOR ACTIONS OF THIS KNOWN REPEAT OFFENDER.

14            **THE COURT:**  OKAY.

15            **MS. ANDRUS:**  AND WE THINK IT'S QUITE CLEAR THAT IT

16   WOULD NOT BE UNFAIR TO DO SO, AND WE THINK THE NINTH CIRCUIT IN

17   *BILLINGS* SAID IT; WE THINK *YAMAGUCHI* SUPPORTS IT, AS WELL AS

18   *XUE LU*.

19            **THE COURT:**  OKAY.  SO BEFORE WE GO TO THE CMC, YOU

20   GET THE LAST WORD.  IT'S YOUR MOTION.  ANYTHING ELSE YOU WANT

21   TO SAY ON RESPONDEAT SUPERIOR?

22            **MR. BYRNE:**  YES, YOUR HONOR.

23            FIRST OF ALL, *YAMAGUCHI* ACTUALLY HELD UNDER

24   RESPONDEAT SUPERIOR ANALYSIS THAT THE EMPLOYER WASN'T

25   NECESSARILY LIABLE.  IT DID EXAMINE FEHA LIABILITY.  BUT

1    THERE'S TWO DIFFERENT EXAMINATIONS THERE, SO I JUST WANTED TO

2    STRAIGHTEN THE RECORD OUT ON THAT.  THERE WAS NOT A HOLDING THE

3    COOKS ACTIONS FELL WITHIN SCOPE OF EMPLOYMENT.

4          SECOND OF ALL, *BILLINGS* CASE, POLICE OFFICER, THAT

5    FALLS IN THE *MARY M.* CATEGORY OF CASES WHERE THERE'S SPECIAL

6    CONCERN ABOUT AUTHORITY GIVEN TO POLICE OFFICERS, AND,

7    OBVIOUSLY, SPREADING THE COST TO THE COMMUNITY IS FOUND TO BE

8    JUSTIFIED IN THAT CIRCUMSTANCE.

9          THE *DOE VERSUS UBER*, JUDGE ILLSTON EXAMINED THE

10   CRIMINAL BACKGROUND CHECK ISSUE ONLY TO THE EXTENT WHETHER OR

11   NOT HOLDING UBER RESPONSIBLE UNDER THAT CIRCUMSTANCE WOULD

12   PREVENT FUTURE REOCCURRENCES UNDER A POLICY EXAMINATION.

13         HERE WE HAVE FEHA TRAINING FOR CALIFORNIA EMPLOYEES

14   FOR SEXUAL HARASSMENT.  SO THE RECURRENCE -- AS FAR AS WHAT SHE

15   WAS TALKING ABOUT, YOU KNOW, INSTITUTING CRIMINAL BACKGROUND

16   CHECKS, WHICH MAY OR MAY NOT HAVE CAUGHT THIS PARTICULAR

17   PERSON, BUT WE HAVE THAT PARTICULAR POLICY CONCERN -- NOT ALL

18   OF THEM, OBVIOUSLY, BUT THAT PARTICULAR POLICY CONCERN TAKEN

19   CARE OF IN THIS CASE.

20         AND I JUST WANT TO SAY ONE FINAL THOUGHT.  NO ONE

21   CONDONES THE FACTS AS PLED IN THIS COMPLAINT, BUT TO SUGGEST

22   THAT THE FACTS PLED IN THIS COMPLAINT ARE REPEATED, INEXCUSABLE

23   ACTS ON THE LEVEL OF A HARVEY WEINSTEIN OR MATT LAUER, OR OTHER

24   PEOPLE IN THE NEWS LATELY, IS REALLY TAKING THIS A LITTLE TOO

25   FAR.

1          BASICALLY, THE ALLEGATIONS ARE THAT HE GROPED

2   SOMEBODY AT SOME POINT IN TIME AND THAT HE DRANK TOO MUCH, BUT

3   THERE'S NOTHING APPROACHING AT ALL THIS TYPE OF SEXUAL

4   MISCONDUCT THAT HAPPENED THAT THE PLAINTIFF IS PLEADING IN THIS

5   CASE.  I JUST WANT TO STRAIGHTEN THE RECORD FOR THAT.

6          **THE COURT:**  I THINK I'M THE ONE THAT RAISED HARVEY

7   WEINSTEIN.

8          **MR. BYRNE:**  YES.

9          **THE COURT:**  NOT PLAINTIFF'S COUNSEL.

10          **MR. BYRNE:**  NO, NO, YOU DID.  THE COURT DID.

11          OTHER THAN THAT, YOUR HONOR, WE WOULD SUBMIT ON THE

12   PAPERS.

13          **THE COURT:**  OKAY.  CAN WE TURN TO THE CMCS?

14          **MS. ANDRUS:**  YES, YOUR HONOR.

15          **MR. BYRNE:**  OH, ONE OTHER THING, YOUR HONOR.  YOU

16   DIDN'T EXAMINE THE DUE PROCESS ARGUMENT ON --

17          **THE COURT:**  I DON'T THINK I NEED --

18          **MR. BYRNE:**  OKAY.

19          **THE COURT:**  -- ARGUMENT ON IT.

20          **MR. BYRNE:**  UNDERSTOOD.

21          **THE COURT:**  SO LET'S MOVE ON TO THE CMC IN THIS CASE,

22   AND THEN WE'LL TALK ABOUT IT IN THE CASE AGAINST DINNIS.

23          SO STARTING WITH ADR, COUNSEL WOULD LIKE TO HAVE A

24   SETTLEMENT CONFERENCE WITH JUDGE BEELER.  IN OUR DISTRICT WE

25   TEND TO NOT MAKE THAT ASSIGNMENT TO A MAGISTRATE JUDGE, BECAUSE

1    IT'S A RESOURCE ISSUE, UNLESS THERE'S REALLY GOOD REASON TO GO

2    BEFORE A SETTLEMENT JUDGE AS OPPOSED TO A MEDIATOR, AT LEAST AS

3    A FIRST RECOURSE.

4              SO TELL ME WHY YOU THINK IT MAKES SENSE TO ASSIGN

5    THIS TO A SETTLEMENT JUDGE INSTEAD OF A MEDIATOR?

6              **MR. BYRNE:**  I'LL TAKE A SHOT.  ONLY BECAUSE I HAVE

7    CASE IN FRONT OF JUDGE BEELER RIGHT NOW, AND SHE'S FANTASTIC.

8              **THE COURT:**  YES, SHE IS.

9              **MR. BYRNE:**  AND SHE, IN ASSIGNING A CASE OUT, ALLOWED

10   US TO CHOOSE JUDGE LAPORTE.  SHE THOUGHT YOU WERE GREAT AS

11   WELL.  BUT SHE SAID, "ANYTHING I CAN DO TO HELP."  AND SO WE --

12   I TOOK THAT, IN TALKING TO MS. ANDRUS, TO HEART AND SUGGESTED

13   PERHAPS WE COULD HAVE THIS COURT REFER US, BECAUSE I KNOW JUDGE

14   BEELER WOULD HAPPILY TAKE IT ON, NOT THAT I'VE TALKED TO HER

15   ABOUT IT, OBVIOUSLY, BUT THAT WAS MY THOUGHT, AND I THINK SHE

16   WOULD BE GREAT FOR THIS CASE.

17             **THE COURT:**  I THINK ANY OF US WOULD BE VERY HAPPY TO

18   HELP ANYONE WHO WOULD LIKE OUR HELP, SO THAT'S NOT THE ISSUE.

19   AND I THINK SHE'S OUTSTANDING, A WONDERFUL COLLEAGUE.  I'M SURE

20   SHE WOULD HELP.  IT'S A DIFFERENT QUESTION, WHICH IS WE WERE

21   ASKED -- THE COURT WAS ASKED, ALL OF US AS A WHOLE, THE

22   DISTRICT JUDGES AND MAGISTRATE JUDGES, TO LOOK AT THE RESOURCE

23   OF MAGISTRATE JUDGE SETTLEMENT CONFERENCES AND TO MAKE SURE

24   THAT THOSE ARE APPROPRIATELY ALLOCATED BECAUSE A LOT OF PEOPLE

25   WANT THEM.

1          **MR. BYRNE:**  OF COURSE.

2          **THE COURT:**  BUT WE CAN'T AFFORD THEM IN EVERY

3   INSTANCE BECAUSE OF THE DEMANDS OF THE DOCKETS.  OKAY?  SO

4   THAT'S WHY WE LOOK AT THAT AS NOT THE FIRST OPTION OR THE

5   FIRST -- EVEN THOUGH PEOPLE WANT THAT, IT'S NOT NECESSARILY

6   WHAT WE SHOULD DO.

7          SOMETIMES THERE'S REALLY GOOD REASONS TO HAVE ONE,

8   AND SO THAT'S WHY I'M PROBING A LITTLE BIT.  I UNDERSTAND

9   WANTING TO APPEAR IN FRONT OF HER, AND I'M NOT SAYING NO. I

10  JUST WANT TO UNDERSTAND THE REASONS.

11         MS. ANDRUS?

12         **MS. ANDRUS:**  YES, YOUR HONOR.  THERE WOULD BE TWO

13  REASONS WHY PLAINTIFFS WOULD PROMOTE THE IDEA OF USING A

14  JUDICIAL OFFICER TO TRY TO RESOLVE THIS CASE.  THE FIRST IS

15  THAT, IN MY EXPERIENCE, CORPORATE DEFENDANTS LISTEN TO FEDERAL

16  JUDGES, AND SO I FIND THEY CAN BE MUCH MORE EFFICIENT THAN

17  GOING TO A PRIVATE MEDIATOR.

18         **THE COURT:**  IT WOULDN'T BE PRIVATE.  WE COULD SEND

19  YOU TO ONE OF OUR PANEL MEDIATORS, AND OUR PANEL MEDIATORS ARE

20  SELECTED -- THERE IS A PROCESS IN HOUSE -- YOU CAN'T PICK WHO

21  IT IS GOING TO BE, BUT OUR ADR DEPARTMENT MAKES AN APPROPRIATE

22  REFERRAL.

23         **MS. ANDRUS:**  RIGHT.  AND THOSE PEOPLE ARE NOT FEDERAL

24  JUDGES, TYPICALLY.

25         **THE COURT:**  NOT TYPICALLY; SOME OF THEM ARE.

1              **MS. ANDRUS:**  RETIRED ONES?  ANYWAY, I MEAN, YOU KNOW,

2      WE HAVE USED THAT PROCESS BEFORE, THE COURT APPOINTED

3      MEDIATORS, AND I CAN IMAGINE DOING THAT HERE.

4              BUT THE SECOND REASON IS, QUITE FRANKLY, YOUR HONOR,

5      WHEN A PLAINTIFF BRINGS A CASE LIKE THIS AGAINST A COMPANY THAT

6      HAS UNLIMITED RESOURCES, IT'S KIND OF A PUNCH IN THE GUT TO

7      SPEND $8,000 TO PAY FOR HALF OF A PRIVATE MEDIATOR'S FEES FOR A

8      DAY.  BUT, AGAIN, THAT'S TALKING ABOUT PRIVATE MEDIATION, NOT

9      ABOUT THE COURT-APPOINTED MEDIATION.  SO I HAVE NO OPPOSITION

10     TO COURT-APPOINTED MEDIATION, YOUR HONOR.  IT WOULD BE OUR

11     PREFERENCE TO USE A JUDGE IF THAT WERE PERMITTED.

12             **THE COURT:**  AND YOU'RE ALSO ASKING FOR JUDGE BEELER.

13             **MS. ANDRUS:**  WELL, I'VE ACCEDED TO THEIR REQUEST.  I

14     THINK SHE WOULD BE VERY APPROPRIATE FOR THIS CASE.

15             **MR. BYRNE:**  ONE OTHER THOUGHT, YOUR HONOR.  IN THIS

16     PARTICULAR CASE, THE AIRLINE DEFENDANTS HAVE BEEN BEFORE JUDGE

17     BEELER ON SETTLEMENT BEFORE, AND SO THERE IS A -- I WOULD SAY A

18     PRESUMPTION THAT SHE CAN GET SOMETHING DONE.  I KNOW THERE CAN

19     BE MANY PRESUMPTIONS.  IT DOESN'T MEAN SOMEONE ELSE CAN'T.  BUT

20     I THINK IT WOULD HELP TEE UP ANY POTENTIAL SUCCESS FOR

21     SETTLEMENT BY USING JUDGE BEELER.

22             SO THAT'S THE FINAL THOUGHT.

23             **THE COURT:**  OKAY.  LET ME GIVE THAT ONE SOME THOUGHT.

24     I'LL MAKE A DECISION ON IT.  YOU'LL SEE IT IN THE MINUTE ORDER.

25     OKAY?

1          **MS. ANDRUS:**  THANK YOU, YOUR HONOR.

2          **MR. BYRNE:**  THANK YOU, YOUR HONOR.

3          **THE COURT:**  ALL RIGHT.  THANK YOU FOR YOUR

4    PRESENTATIONS ON THAT.

5          NOW, ON AMENDMENTS, IS ANYONE GOING TO ADD ANY

6    PARTIES AT THIS POINT?

7          **MS. ANDRUS:**  PLAINTIFFS DO NOT INTEND TO, YOUR HONOR.

8          **MR. BYRNE:**  NO, YOUR HONOR.

9          **THE COURT:**  OKAY.  SO NO PARTIES CAN BE ADDED IN THIS

10   CASE GOING FORWARD.  OKAY?

11          **MS. ANDRUS:**  THANK YOU.

12          **THE COURT:**  YOU'RE GOING TO FILE YOUR DOE MOTION

13   RIGHT AWAY.

14          **MS. ANDRUS:**  YES, YOUR HONOR.

15          **THE COURT:**  AND THEN WHAT ABOUT A DEADLINE TO AMEND

16   THE PLEADINGS FOR CLAIMS OR DEFENSES?  WHAT'S APPROPRIATE HERE?

17   NINETY DAYS?  DO YOU NEED MORE THAN THAT?

18          **MS. ANDRUS:**  NINETY DAYS WOULD BE AGREEABLE TO

19   PLAINTIFFS, YOUR HONOR.

20          **MR. BYRNE:**  YES, YOUR HONOR.

21          **THE COURT:**  OKAY.  NINETY DAYS TO AMEND THE PLEADINGS

22   FOR CLAIMS AND DEFENSES.

23          NOW, FOR THE TRIAL SCHEDULE, YOU ALL ASKED FOR A

24   PRETTY -- PRETTY AGGRESSIVE TRIAL DATE, AND YOU WANTED MAY,

25   WHICH I CAN GIVE YOU, BUT I'LL TELL YOU IF WE DO THAT, THE

1   DATES THAT YOU'RE -- THEY'RE GOING TO BE EVEN MORE DEMANDING

2   DATES ON DISCOVERY AND EXPERT WORK THAN WHAT YOU ANTICIPATED.

3   THE REASON FOR THAT IS BECAUSE I TRY TO MAKE SURE YOU HAVE TIME

4   BETWEEN THE HEARING ON SUMMARY JUDGMENT AND PRETRIAL SO I COULD

5   TURN SOMETHING AROUND FOR YOU SO YOU DON'T HAVE TO TRY TO GUESS

6   AT HOW I MIGHT RULE ON DIFFERENT THINGS AND PREPARE MANY

7   DIFFERENT WAYS FOR TRIAL.  I FIND THAT TO BE USEFUL, CERTAINLY

8   AS A LAWYER TO BE --

9            **MR. BYRNE:**  YEAH, YEAH.

10           **THE COURT:**  -- TO BE REALLY HARD WHERE WE DIDN'T HAVE

11   THAT HAPPEN.

12           SO BECAUSE OF THAT, IF I GAVE YOU, FOR EXAMPLE, A MAY

13   13TH TRIAL DATE, YOUR CLOSE OF FACT DISCOVERY WOULD BE

14   DECEMBER 18TH.  YOUR EXPERT DISCOVERY WOULD BE CLOSED

15   JANUARY 15TH, WITH A VALENTINE'S DAY HEARING FOR DISPOSITIVE

16   MOTIONS.  THAT SEEMS PRETTY AMBITIOUS.  IF I GAVE YOU A JULY

17   DATE, THEN EVERYTHING MOVES OUT A COUPLE OF MONTHS.  IT'S UP TO

18   YOU.

19           **MR. BYRNE:**  I'M FINE WITH A JULY DATE, YOUR HONOR,

20   LATE, PROBABLY LATE JULY.

21           **THE COURT:**  I'M LOOKING AT JULY 8TH.

22           **MR. BYRNE:**  I KNOW I HAVE A PREPLANNED VACATION END

23   OF JUNE, SO I WOULD PREFER TO KICK IT OUT IF I COULD, BUT...

24           **THE COURT:**  MS. ANDRUS, HOW ARE THINGS LOOKING?

25           **MS. ANDRUS:**  JULY 8TH WOULD BE FINE, YOUR HONOR.

1    JULY 15TH WOULD ALSO BE FINE.

2              **THE COURT:**  WOULD JULY 15TH WORK?  WHEN DO YOU GET

3    BACK FROM VACATION?

4              **MR. BYRNE:**  END OF JUNE, END OF JUNE, SO RIGHT BEFORE

5    4TH OF JULY.  SO THIRD WEEK IN JULY WOULD BE BETTER, BUT I CAN

6    MAKE THE SECOND WEEK WORK.

7              **MS. ANDRUS:**  YOUR HONOR, I CAN'T DO THE THIRD WEEK IN

8    JULY.  I'M SORRY.

9              **MR. BYRNE:**  THAT'S FINE.  WE'LL WORK WITH IT.

10             **THE COURT:**  MS. GARCIA, MAY I ASK YOU TO TAKE A LOOK

11   AT JULY 13TH?

12             **THE CLERK:**  YES, YOUR HONOR.

13             **THE COURT:**  CLICK DOWN TO THE NEXT LINE.  GO UP ONE

14   TO THE 8TH SO I CAN LOOK OVER YOUR SHOULDER.  OKAY.  SO ON THE

15   13TH -- MS. GARCIA, CAN YOU --

16             **THE CLERK:**  I CLICKED ON THE 15TH.

17             **THE COURT:**  SORRY.  THE 15TH.  COULD YOU GO AHEAD AND

18   PREPARE A SCHEDULE, GIVE US ONE TO THAT?

19             WHILE SHE'S DOING THAT, LET'S TALK ABOUT THE SECOND

20   CASE, MS. ANDRUS.  I KNOW YOU INFORMED ME THAT MR. DINNIS HAS

21   NOW BEEN SERVED IN AUSTRALIA.

22             **MS. ANDRUS:**  THAT'S RIGHT.

23             **THE COURT:**  HAS NOT MADE AN APPEARANCE, BUT I THINK

24   HE WAS PRETTY RECENTLY SERVED, RIGHT?

25             **MS. ANDRUS:**  NO, HE WAS SERVED MORE THAN A COUPLE OF

1    MONTHS AGO.

2            **THE COURT:**  OKAY.

3            **MS. ANDRUS:**  IN JUNE MAYBE.

4            **THE COURT:**  IT'S THE HAGUE CONVENTION, RIGHT?

5            **MS. ANDRUS:**  YES.

6            **THE COURT:**  OKAY.  SO HAS HIS DEADLINE FOR ANSWERING

7    PASSED?

8            **MS. ANDRUS:**  I BELIEVE SO, YES.

9            **THE COURT:**  WHAT DO YOU INTEND TO DO WITH RESPECT TO

10   DINNIS?

11           **MS. ANDRUS:**  WELL, I HAVE A DEFAULT JUDGMENT ENTERED

12   AND THEN GO THROUGH A PROVE-UP PROCESS WITH YOU.  I THINK THE

13   ONLY DIFFICULTY WITH IT, REALLY, IS TIMING, GIVEN THAT WE HAVE

14   MULTIPLE DEFENDANTS AND GIVEN THE POSSIBILITY THAT PROVING UP

15   DEFAULT AGAINST DINNIS BEFORE SITTING A JURY TO DISCUSS HIS

16   BEHAVIOR AS WELL IS POTENTIALLY CONFLICTING, HAS THE POTENTIAL

17   FOR CONFLICTING -- ANYWAY, WHAT I WAS PROPOSING, YOUR HONOR,

18   WAS THAT WE JUST KICK THAT DECISION DOWN THE ROAD A LITTLE BIT,

19   BECAUSE THERE IS DISCOVERY THAT NEEDS TO BE CONDUCTED IN THIS

20   CASE THAT I THINK WILL HELP INFORM A PROVE-UP AGAINST

21   MR. DINNIS.

22           **THE COURT:**  OKAY.

23           **MS. ANDRUS:**  SO I HAD REQUESTED THAT WE JUST HAVE

24   ANOTHER STATUS CONFERENCE AT THE CLOSE OF DISCOVERY IN THIS

25   CASE TO GIVE BOTH PARTIES HERE A FULL OPPORTUNITY TO SEE WHAT

1    THE CASE LOOKS LIKE, HOW IT'S GOING TO BE TRIED, IF THERE ARE

2    ANY ISSUES THAT CAN BE AGREED UPON BY STIPULATION, IF ANYTHING

3    IS GOING TO BE BIFURCATED.  WE DON'T ANTICIPATE BIFURCATION AT

4    THIS POINT, BUT I JUST FELT LIKE AT THAT STAGE, WE'D HAVE A LOT

5    MORE INFORMATION TO HELP US COME UP WITH A PLAN.

6            AND, OF COURSE, I WOULD INVITE YOUR HONOR'S THOUGHTS

7    ON WHEN A DEFAULT SHOULD BE PROVED UP WHEN THERE ARE MULTIPLE

8    DEFENDANTS.  IT DOESN'T HAPPEN ALL THE TIME.

9            **THE COURT:**  IT DOESN'T.  I MEAN, THIS IS A FAIRLY

10   UNIQUE SITUATION.  THE OTHER THING I SHOULD -- THE OTHER

11   WRINKLE IS THE QUESTION WHETHER I NEED TO REASSIGN THIS IF HE'S

12   NOT GOING TO APPEAR.  WE NOW HAVE -- WELL, THIS HASN'T REALLY

13   CHANGED.  IF I DON'T HAVE THE CONSENT OF ALL PARTIES AND IF

14   SOMEONE IS NOT APPEARING, THEN BY DEFINITION I DON'T, THEN IT'S

15   TO BE REASSIGNED.

16           BUT I THINK THAT -- WHETHER I REASSIGN IT NOW VERSUS

17   LATER IS ONE QUESTION, AND THEN ALSO EVEN IF I DO REASSIGN NOW,

18   I THINK THAT JUDGE WILL WANT TO KNOW, WHAT'S THE IMPACT ON THIS

19   RELATED CASE.

20           LET ME THINK THROUGH SOME OF THOSE.  FOR NOW IT

21   CERTAINLY MAKES SENSE TO PUT THIS OUT FOR STATUS ON THE DINNIS

22   MATTER TO GIVE ALL OF THIS SOME TIME TO PERCOLATE.

23           DO YOU HAVE ANY THOUGHTS, BECAUSE THIS IMPLICATES

24   YOUR CLIENTS AS WELL?  I'M HAPPY TO HEAR YOU ON WHAT MAKES

25   SENSE FROM YOUR PERSPECTIVE, MR. BYRNE.

1          **MR. BYRNE:**  I THINK THAT -- I DON'T SEE A RUSH TO

2    HAVING TO TAKE A DEFAULT AT THIS POINT IN TIME.  SO I REALLY

3    LEAVE IT TO THE DISCRETION OF THE PLAINTIFFS AND THE COURT.  I

4    THINK YOU COULD PROBABLY PROVE UP DAMAGES.  I THINK YOU COULD

5    GO THROUGH THAT PROCESS WITHOUT NECESSARILY AFFECTING OUR CASE

6    NEGATIVELY.  BUT, AGAIN, I'LL LEAVE IT TO THE COURT AND

7    PLAINTIFFS.

8          **THE COURT:**  I MEAN, IN DEFAULT IT'S THE *ITEL* FACTORS,

9    AND YOU GO THROUGH AND ASSUMING IT'S WELL PLEADED, THEN THOSE

10   ON THE SORT OF LIABILITY QUESTION IT'S TAKEN AT FACE VALUE.

11   MR. BYRNE IS RIGHT.  IT'S REALLY THE DAMAGES THAT NEED TO BE

12   PROVED UP.

13         SO, AGAIN, WHY DON'T WE GIVE THIS SOME THOUGHT?  I

14   DON'T WANT TO PREJUDICE ANYONE IN THIS CASE.  I DON'T THINK

15   THERE'S A RUSH, BUT THERE ARE SOME MANAGEMENT ISSUES AND THE

16   REASSIGNMENT ISSUE WE NEED TO DEAL WITH AT SOME POINT.

17         OKAY.  SO HERE WE NOW HAVE THE SCHEDULE.  I'M GOING

18   TO GIVE TO YOU.  PLEASE JOT THESE DATES DOWN TO MAKE SURE THEY

19   WORK FOR YOU, BECAUSE ONCE I ISSUE THESE DATES I USUALLY DON'T

20   CHANGE THEM UNLESS THERE'S A REALLY GOOD REASON.  OKAY?

21         SO FIRST DATE TO JOT DOWN:  FEBRUARY 26TH, 2019.

22   THAT'S GOING TO BE THE CLOSE OF FACT DISCOVERY AS WELL AS THE

23   DEADLINE FOR EXPERT DISCLOSURE.

24         MARCH 12TH, REBUTTAL EXPERTS DISCLOSURE.  MARCH 26TH,

25   CLOSE OF EXPERT DISCOVERY.  APRIL 25TH, LAST DAY TO HEAR

1    DISPOSITIVE MOTIONS.

2            YOUR PRETRIAL WILL BE JULY 3RD FOR A JULY 15TH TRIAL,

3    A JURY TRIAL THAT -- I THINK YOU ASKED FOR ONE DAY FOR JURY

4    SELECTION AND THEN FOUR DAYS OF TRIAL.  SO IT WILL BE A

5    FIVE-DAY JURY TRIAL.

6            SO, MR. BYRNE, LET ME JUST POINT OUT THAT WHEN YOU

7    SEE THE DEADLINES IN THE PRETRIAL, SOME OF THAT MIGHT CONFLICT

8    WITH YOUR VACATION, SO YOU SHOULD JUST WORK IT OUT -- I'M SURE

9    YOU CAN WORK IT OUT WITH MS. ANDRUS TO AGREE ON SOME EARLIER

10   DATES, PERHAPS, TO GET THAT MATERIAL IN.

11           **MR. BYRNE:**  OKAY.

12           **THE COURT:**  SEEING AS I GAVE YOU A LATER TRIAL DATE

13   THAN YOU THOUGHT, IT SEEMS LIKE YOU CAN ADJUST --

14           **MR. BYRNE:**  YES.

15           **THE COURT:**  -- IN THE OTHER DIRECTION.

16           THE OTHER THING I JUST WANT TO POINT OUT IS, IN YOUR

17   SCHEDULE, YOUR JOINT SCHEDULE, YOU WANTED TO HAVE YOUR EXPERTS'

18   DEADLINES COME FIRST AND THEN YOUR DISCOVERY, YOUR FACT

19   DISCOVERY CUTOFF.

20           **MR. BYRNE:**  THAT WAS HER PREFERENCE.  I HAVE NOT DONE

21   IT THAT WAY, BUT...

22           **MS. ANDRUS:**  I'M FINE WITH WHAT YOUR HONOR IS

23   PROPOSING.

24           **THE COURT:**  OKAY.

25           **MS. ANDRUS:**  THE ONE DATE I HAVE TO ASK IS COULD WE

1   POSSIBLY MOVE BY ONE DAY IS APRIL 25TH, THE LAST DAY TO HEAR

2   DISPOSITIVE MOTIONS.  I'M SCHEDULED TO BE OUT OF TOWN ON A

3   BUSINESS MEETING.  I'M ON AN EXECUTIVE COMMITTEE, AND THAT'S AN

4   ALL-DAY MEETINGS ON THAT DAY.  IF THAT'S THE ONLY DAY YOUR

5   HONOR CAN DO THAT, I WILL MISS THAT.  BUT IT IS AN OBLIGATION I

6   TAKE KIND OF SERIOUSLY, SO I'M HOPING NOT TO MISS THAT.

7           **THE COURT:**  I UNDERSTAND.  BUT WHAT HAPPENS IS THAT'S

8   THE LAST DAY TO HEAR.  SO WHOEVER IS GOING TO FILE JUST NEEDS

9   TO CALCULATE BACK.  SO IF WE CHANGE THE DATE, IT'S GOING TO GO

10  ON MY NORMAL MOTION CALENDAR -- WHICH, MS. GARCIA, I'M GOING TO

11  ASK YOU TO PULL UP -- WHICH WOULD EITHER BE TWO WEEKS FORWARD

12  OR TWO OR THREE WEEKS LATER.  I'M OKAY WITH THAT BECAUSE I

13  THINK THERE'S ENOUGH OF A MARGIN FOR ME TO TURN AROUND AN

14  ORDER.  SO DO YOU WANT ME TO PUSH IT OUT TWO WEEKS?

15          **MR. BYRNE:**  THAT WOULD BE FINE WITH ME, YOUR HONOR.

16          **THE COURT:**  I WILL GIVE YOU THE EXACT DATE.

17          MS. GARCIA, CAN YOU TAKE A LOOK AT -- JUST GO AHEAD

18  AND GO TO THE CALENDAR IN APRIL AND MAY 2019.  SO IF IT'S THE

19  25TH, IT WOULD EITHER BE THE 11TH OF APRIL IF WE WERE MOVING IT

20  UP.  NOW LET'S GO INTO MAY.  IT WOULD BE THE 9TH, 9TH OF MAY.

21          **MS. ANDRUS:**  BOTH OF THOSE WORK FOR PLAINTIFF.

22          **MR. BYRNE:**  I WOULD PREFER MAY 9TH, YOUR HONOR.

23          **THE COURT:**  ARE YOU OKAY WITH THAT?

24          **MS. ANDRUS:**  YES.  THANK YOU, YOUR HONOR.

25          **THE COURT:**  SO WE'RE JUST GOING TO ADJUST THAT ONE

1    DAY.

2              **MS. ANDRUS:**  THANK YOU VERY MUCH.

3              **THE COURT:**  DOES THAT SCHEDULE WORK OTHERWISE FOR

4    YOU, MS. ANDRUS?

5              **MS. ANDRUS:**  YES, YOUR HONOR.

6              **THE COURT:**  MR. BYRNE, HOW ABOUT FOR YOU?

7              **MR. BYRNE:**  YES, YOUR HONOR.

8              **THE COURT:**  OKAY.  SO I'LL ISSUE A SCHEDULE FOR JURY

9    TRIAL WITH THAT TRIAL AND MANAGEMENT SCHEDULE.  I'LL THINK

10   ABOUT THE ADR ISSUE.  AND I THINK I HAVE COVERED WHAT I NEED TO

11   COVER EXCEPT FOR YOUR NEXT CMC DATE.

12             OH, SORRY.  FOR ADR, WHEN DO YOU THINK IT SHOULD

13   HAPPEN, WHATEVER THE PROCESS IS?  THE PRESUMPTIVE IS 90 DAYS,

14   AND I THINK IN WHAT YOU SENT TO ME YOU THOUGHT 90 DAYS WAS

15   FINE, BUT SINCE YOU'RE HERE LET'S TALK IT THROUGH.

16             **MR. BYRNE:**  FROM A DEFENSE PERSPECTIVE, I'LL LEAVE IT

17   TO THE PLAINTIFFS TO DETERMINE WHEN THEY'LL BE READY.

18             **MS. ANDRUS:**  YOUR HONOR, WE RECENTLY PROPOUNDED

19   DISCOVERY AND SENT SOME DEPO NOTICES OVER TO DEFENDANTS.  I

20   THINK -- HANG ON.  I WROTE DOWN THE DATE.  I THINK, HONESTLY,

21   WE NEED AT LEAST 60 DAYS.  I WAS THINKING IF WE ARE LOOKING TO

22   PICK A SPECIFIC DATE, WE MIGHT PICK SOMETIME IN THE SECOND WEEK

23   OF NOVEMBER.  I DON'T THINK IT WOULD BE FRUITFUL TO HAVE A

24   CONVERSATION -- SETTLEMENT CONVERSATION PRIOR TO THAT.

25             **THE COURT:**  SO WHY DON'T I JUST SAY WITHIN 90 DAYS?

1          **MS. ANDRUS:**  THAT WOULD BE FINE, YOUR HONOR.

2          **MR. BYRNE:**  YES, YOUR HONOR.

3          **THE COURT:**  RIGHT?  SO THAT GIVES YOU SOME ROOM

4    EITHER WAY.  BUT YOU THINK YOU'LL BE READY WITHIN -- LET'S SEE.

5    THAT GETS US ABOUT 60 DAYS OUT.  YOU THINK YOU'D BE READY IN

6    THE 60 TO 90-DAY WINDOW?

7          **MS. ANDRUS:**  I THINK THAT WOULD BE A GREAT TIME TO

8    HAVE A CONVERSATION, YES, YOUR HONOR.

9          **THE COURT:**  OKAY.

10         **MR. BYRNE:**  YES, YOUR HONOR.

11         **THE COURT:**  OKAY.  SO LET ME HAVE YOU BACK IN ABOUT

12   120 DAYS.

13         **MS. ANDRUS:**  OKAY.

14         **MR. BYRNE:**  OKAY.

15         **THE COURT:**  MS. GARCIA, CAN YOU FIND A CMC ABOUT FOUR

16   MONTHS OUT?

17         **THE CLERK:**  YES, YOUR HONOR.

18         **THE COURT:**  ONE LITTLE WRINKLE.  IF I DECIDE TO GO

19   WITH JUDGE BEELER, WHO HAS A VERY PACKED CALENDAR, I DON'T KNOW

20   IF SHE'S GOING TO BE AVAILABLE FROM 60 TO 90 DAYS.  SO IT MIGHT

21   BE ONE OF THOSE THINGS WHERE IT'S ASSIGNED HER TO HOPEFULLY DO

22   IT WITHIN THAT WINDOW, IF NOT, AS SOON THEREAFTER AS IS

23   CONVENIENT TO HER CALENDAR.  IS THAT ALL RIGHT?

24         **MR. BYRNE:**  FINE WITH DEFENSE.

25         **MS. ANDRUS:**  THAT'S OKAY WITH US.  THANK YOU, YOUR

1    HONOR.

2              **THE COURT:**  OKAY.

3              **THE CLERK:**  JANUARY 16TH.

4              **THE COURT:**  JANUARY 16TH WILL BE YOUR NEXT CMC AT

5    1:30.  IT'S A WEDNESDAY AT 1:30.  AND YOUR UPDATED PAPERS WILL

6    BE DUE JANUARY 9TH.  DOES THAT WORK FOR EVERYONE?

7              **MS. ANDRUS:**  YES, THANK YOU, YOUR HONOR.

8              **THE COURT:**  OKAY.  SO THAT'S WHAT I'VE GOT.  IS THERE

9    ANYTHING ELSE WE SHOULD COVER?

10             **MS. ANDRUS:**  I DON'T BELIEVE SO, YOUR HONOR.  THANK

11   YOU.

12             **MR. BYRNE:**  NO, YOUR HONOR.

13             **THE COURT:**  ALL RIGHT.  THANK YOU BOTH.

14             **MR. BYRNE:**  THANK YOU.

15             (PROCEEDINGS ADJOURNED AT 12:10 P.M.)

16

17

18

19

20

21

22

23

24

25

**<u>CERTIFICATE OF TRANSCRIBER</u>**

    I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT
TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF
THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE
U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE
PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE
ABOVE MATTER.

    I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,
RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN
WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT
FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE
ACTION.

JOAN MARIE COLUMBINI

NOVEMBER 14, 2018